BRIGGS & STRATTON CORPORATION, a Delaware corporation, and Michael Hamilton, Plaintiffs,

v.

Malcolm BALDRIGE, Secretary of the United States Department of Commerce, Lionel H. Olmer, Under Secretary for International Trade, United States Department of Commerce, William French Smith, Attorney General of the United States, and Ronald Reagan, President of the United States, Defendants.

No. 80–C–721.

United States District Court, E. D. Wisconsin.

May 10, 1982.

Quarles & Brady by Elwin J. Zarwell, Samuel J. Recht, Carolyn A. Gnaedinger, and Joan P. Clark, Milwaukee, Wis., for plaintiffs.

Neil H. Koslowe, Cecil Hunt, Asst. Gen. Counsel, Dept. of Commerce, Pamela P.

Breed, Deputy Asst. Gen. Counsel, Daniel C. Hurley, Jr., Dept. of Commerce, Washington, D. C., for defendants.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

This action challenges the constitutionality of certain provisions of the Export Administration Act of 1979, 50 U.S.C.App. § 2401 *et seq.*, and certain regulations which make it unlawful "to comply with, further, or support any boycott fostered or imposed by a foreign country against a country which is friendly to the United States...." 50 U.S.C.App. § 2407(a)(1). In this case, the boycott is that of the League of Arab States against Israel and those companies doing business with Israel. The plaintiffs contend that the act and regulations violate their rights under the first, fifth, and ninth amendments. The parties have submitted a stipulation of facts and have fully briefed cross motions for summary judgment.

## I. FACTUAL BACKGROUND

■ The following résumé is not intended to set forth all the facts, but rather it is designed to provide a framework for the discussion of the issues. The parties have filed a stipulation of facts which I now adopt as a part of the court's findings of fact. However, there is some dispute over what else is properly before me. The government in its brief filed on November 4, 1981, has included a discussion of certain legislative reports and the findings therein. The plaintiffs contend that the parties have stipulated to the facts in this case and that the court "should not consider the government's new, extra-record suddenly obtained 'knowledge'." Plaintiffs' brief, filed November 25, 1981, p. 3. In my opinion, the stipulation of facts does not foreclose my inspecting the legislative background of the statute and regulations. Accordingly, I reject the plaintiffs' contention that I should ignore the material from the reports. *See, e.g., Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 545–46, 98 S.Ct. 2923, 2931–32, 57 L.Ed.2d 932 (1978).

On December 11, 1954, the council of the League of Arab States approved a resolution calling for an economic boycott of Israel. Since that time, a boycott of varying effectiveness has been conducted by members of the League. To implement the boycott, the League formed

"... the Central Boycott Office, with headquarters presently in Damascus, Syria, which facilitates communications among the boycott offices of the individual boycotting states and makes recommendations concerning enforcement of the boycott to the individual states." Stipulation of Facts, ¶ 6.

The boycott is not confined to actual trade with Israel. It also applies to dealings with companies that have been "blacklisted" for activities "deemed to be inconsistent with the purported 'General Principles for the Boycott of Israel' (June 1972), published by the Central Boycott Office and the League of Arab States." Stipulation, ¶ 8. These so-called "principles" are lengthy and intricate, but it is safe to conclude generally that a firm may be blacklisted if it trades with Israel or if it has a relationship with a firm that trades with Israel. *See* stipulation, exh. A, General Principles for the Boycott of Israel (1972), pp. 23–80. The ban on dealing with blacklisted companies has included bans on the importation of products manufactured by, or products containing components manufactured by, such companies. Decisions to blacklist a company are made haphazardly, however, and there are several factors that may result in continued trade with a company despite activity that could be deemed inconsistent with boycott principles. Stipulation, ¶ 23.

"Israel is a country friendly to the United States and is not itself the object of any form of boycott pursuant to United States law or regulation." Stipulation, ¶ 7. In the mid-1970's, Congress became concerned about Arab efforts to pressure American companies into participating in the boycott

of Israel; several examples of such pressure were cited. *See* S.Rep.No.95–104, 95th Cong., 1st Sess. 16–18 (1978) (*Senate Report*); Subcomm. on Oversight and Investigations of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 2d Sess., *Report of the Arab Boycott and American Business* 10–11, 41–42 (Subcomm. Print 1976) (*Boycott Report*).

Congress eventually enacted anti-boycott legislation as an amendment to the Export Administration Act. *See* Pub.L.No.95–52, 91 Stat. 235 (1977); the anti-boycott rules were reenacted as part of the Export Administration Act of 1979, Pub.L.No.96–72, 93 Stat. 503 (codified at 50 U.S.C.App. § 2401 *et seq.* (Supp. III 1979)). Congress was assisted in the preparation of this legislation by representatives of American business, including the Business Roundtable, and representatives of several American Jewish organizations. *See Senate Report*, p. 78; H.R.Rep.No.95–190, 95th Cong., 1st Sess. 5 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 362, 366 (*House Report*). The defendants in this action are the four highest ranking officials of the United States charged with enforcing the act. Their enforcement duties are set forth in the stipulation. *Id.* at ¶¶ 10–13.

Briggs & Stratton is a manufacturer of internal combustion engines; its engines are incorporated as power components in the end products of other manufacturers. Mr. Hamilton is vice-president for international sales for Briggs. Briggs does not manufacture or sell end products; it only manufactures components for end products. Thus the vast majority of its sales are to end product manufacturers who place the Briggs engines into their products.

Briggs' customers usually manufacture their products in large quantities using assembly line techniques. Their products are designed for a particular engine model and the design is not readily alterable. The parties stipulate:

"Manufacturers in Australia, England, France, Germany, Japan, the United States and other countries sell products powered by Briggs engines to customers all over the world. The Arab countries are a segment and only a minor volume segment of this worldwide market. Because Briggs has been placed on some Arab country blacklists, and because of the standardization by its customers on a particular engine model, a number of its customers have notified it that they can no longer use its engines as components of products they will ship not only to the Arab countries but to all other countries as well." Stipulation, ¶ 4.

The parties also agree that there are other, foreign manufacturers of engines with sufficient capacity to supply the foreign market for these engines.

In May, 1977, Briggs received a letter from Georges A. K. Kabbabe, a distributor of Briggs' products in Syria. Stipulation, exh. B. Mr. Kabbabe wrote that a request for an import license for Briggs' products had been refused because Briggs was on a blacklist. He enclosed a letter from the Syrian "Economical Department" that contained seven items which Briggs was to answer. The translation of the seven items reads:

"1—Has the company now or in the past main or branch factories or combinating factories in Israel.

"2—Has the company now or in the past general offices in Israel for its regional or international works.

"3—Has it grant now or in the past the right of utilizing its name or trade marks or patents to persons or establishments or Israel works inside or outside Israel.

"4—Does it share in or own now or in the past shares in Israel works or establishments inside or outside Israel.

"5—Does it now or did it offer in the past any technical assistance to any Israeli work or establishment.

"6—Does it represent now or did it represent in the past any Israel establishment or work inside or outside Israel.

"7—What are the companies which it shares in or with, their nationality and the size or rate of this share." Stipulation, exh. C.

Briggs responded to the letter, answering all seven questions in the negative. *See* stipulation, exh. D. This response was eventually not accepted, however, for Briggs had failed to have its response authenticated by an Arab consular officer, as the letter required. *See* stipulation, exh. E. The parties agree that by the time Briggs received the request for authentication, the regulations challenged at bar prohibited Briggs from responding. Stipulation, ¶ 15.

Subsequent to its failure to return the authenticated response to the questionnaire, Briggs was blacklisted by Syria, Saudi Arabia, Bahrain, Oman, and Kuwait, all members of the Arab League. *See* stipulation, exhs. F & I. Briggs believes that it was blacklisted because of its failure to answer the questionnaire. Stipulation, ¶ 17. This is consistent with the Arab League's General Principles, *see* stipulation, exh. A; ¶ 15, First, g; p. 24. Briggs has been removed from the blacklist, however, and its products are currently accepted in all Arab League states. Stipulation, ¶ 18 and exhs. G & H.

The government acknowledges that the effect on Briggs of being blacklisted is significant:

"Briggs' sales to persons who in turn export their products incorporating Briggs' engines to states which are members of the League of Arab States amounted to in excess of $15,000,000 in Briggs' most recently completed fiscal year ended June 30, 1980. Briggs believes that such sales for the fiscal year ending June 30, 1981 would exceed $15,000,000 but for the fact that some members of the League of Arab States have blacklisted Briggs. Briggs is making active efforts further to increase such sales and believes that there are good prospects for such increases. Such sales are profitable and currently account for the employment of in excess of 100 persons

by Briggs in the United States...." Stipulation, ¶ 1.

This litigation focuses on specific provisions of the anti-boycott legislation and the regulations implementing it. The crucial portion of the statute reads:

"(a)(1) ... [T]he President shall issue regulations prohibiting any United States person, with respect to his activities in the interstate or foreign commerce of the United States, from taking or knowingly agreeing to take any of the following actions with intent to comply with, further, or support any boycott fostered or imposed by a foreign country against a country which is friendly to the United States and which is not itself the object of any form of boycott pursuant to United States law or regulation:

\* \* \* \* \* \*

"(D) Furnishing information about whether any person has, has had, or proposes to have any business relationship (including a relationship by way of sale, purchase, legal or commercial representation, shipping or other transport, insurance, investment, or supply) with or in the boycotted country, with any business concern organized under the laws of the boycotted country, with any national or resident of the boycotted country, or with any other person which is known or believed to be restricted from having any business relationship with or in the boycotting country. Nothing in this paragraph shall prohibit the furnishing of normal business information in a commercial context as defined by the Secretary [of Commerce]." 50 U.S.C.App. § 2407.

The parties have stipulated:

"Commerce Department officials have advised... Briggs that ... any answer made by ... Briggs which is responsive to the request [of the Syrian Economical Department] would contravene the Regulations herein described and that defendants would, upon learning that any information had been furnished by Briggs or on its behalf, in contravention of the Regulations, so construed, seek to impose one

or more of the ... penalties [described in paragraphs 10–12]." Stipulation, ¶ 14.

## II. THE REGULATIONS' PRESUMPTION OF INTENT

The plaintiffs primarily object to the regulations promulgated by the Commerce Department on the issue of intent. These regulations read:

"(e) 'Intent'. (1) Part 369 prohibits a United States person from taking or knowingly agreeing to take certain specified actions with intent to comply with, further, or support an unsanctioned foreign boycott.

"(2) A United States person has the intent to comply with, further, or support an unsanctioned foreign boycott when such a boycott is at least one of the reasons for that person's decision whether to take a particular prohibited action. So long as that is at least one of the reasons for his action, a violation occurs regardless of whether the prohibited action is also taken for non-boycott reasons. Stated differently, the fact that such action was taken for legitimate business reasons does not remove that action from the scope of this part if compliance with an unsanctioned foreign boycott was also a reason for the action.

"(3) Intent is a necessary element of any violation of this part. It is not sufficient that one take action that is specifically prohibited by this part. It is essential that one take such action with intent to comply with, further, or support an unsanctioned foreign boycott. Accordingly, a person who inadvertently, without boycott intent, takes a prohibited action, does not commit any violation of this part.

"(4) Intent in this context means the reason or purpose for one's behavior. It does not mean that one has to agree with the boycott in question or desire that it succeed or that it be furthered or supported. But it does mean that the reason why a particular prohibited action was taken must be established.

"(5) Reason or purpose can be proved by circumstantial evidence. For example, if a person receives a request to supply certain boycott information, the furnishing of which is prohibited by this part, and he knowingly supplies that information in response, he clearly intends to comply with that boycott request. It is irrelevant that he may disagree with or object to the boycott itself. Information will be deemed to be furnished with the requisite intent if the person furnishing the information knows that it was sought for boycott purposes. On the other hand, if a person refuses to do business with someone who happens to be blacklisted, but the reason is because that person produces an inferior product, the requisite intent does not exist.

"(6) Actions will be deemed to be taken with intent to comply with an unsanctioned foreign boycott if the person taking such action knew that such action was required or requested for boycott reasons. On the other hand, the mere absence of a business relationship with a blacklisted person or with or in a boycotted country does not indicate the existence of the requisite intent.

"(7) In seeking to determine whether the requisite intent exists, all available evidence will be examined." 15 C.F.R. § 369.1(e).

Following this regulation are "Examples of Intent"; number (viii) appears to describe the Briggs situation almost exactly.

Briggs argues that the intent regulations "establish a conclusive presumption of wrongful intent contrary to the plain language of the statute and without authority of law, and they interpret the statute in a manner contrary to Congress' intent." Plaintiffs' brief, filed August 24, 1981, p. 15. I will pass the issue of the nature of the presumption for the moment, in favor of addressing the issue of whether the regulations improperly interpret the statute.

■ Briggs argues that the regulations read the intent element out of the statute, making the answering of a questionnaire a violation, even though Briggs does not have

the "intent to comply with, further, or support the boycott." Briggs points to paragraph 21 of the stipulation, part of which reads:

"Briggs has in the past and intends in the future to trade with persons in Israel and in all other respects conduct its business without regard to such purported 'General Principles [for the Boycott of Israel].' "

Three versions of the act in question were considered by Congress; two were Senate bills, one was in the House. At the time, there was concern that a company might violate the statute by some inadvertent act. *See Arab Boycott: Hearings on S. 69 and S. 92 before the Subcomm. on Int'l Finance of the Senate Comm. on Banking, Housing, and Urban Affairs*, 95th Cong., 1st Sess. 279 (1977) *(Senate Hearings); Extension of the Export Administration Act of 1969: Hearings and Markup before the House Comm. on Int'l Relations*, 95th Cong., 1st Sess. 265 (1977) *(House Hearings)*. The House version and one Senate version did not use the word "intent"; representatives of the executive branch took the position that the three bills provided the same protection against inadvertent violations. *Senate Hearings*, p. 458; *House Hearings*, p. 238. The Senate Committee on Banking, Housing, and Urban Affairs issued a favorable report on the Senate version that used the intent language, *Senate Report*, pp. 37, 61; this version eventually became the challenged portion of the statute.

In the report expressing approval of the present language, the Senate committee made clear that it wished to prohibit the conduct described at bar.

"[The act] prohibits furnishing information about whether any person has, has had, or proposes to have any business relationship with or in the boycotted country, with any business concern organized under the laws of the boycotted country, with any national or resident of the boycotted country, or with any other person known or believed to be restricted from having any business relationship with or in the boycotted country. The purpose of this provision is to prohibit U.S. persons from supplying information about whether they have business dealings with boycotted countries or blacklisted persons where such information is supplied with intent to comply with, further, or support a boycott. However, nothing in paragraph 4A(a)(1) is to prohibit the furnishing of normal business information in a commercial context as defined by the Secretary of Commerce.

"The most common example of prohibited information in the present context is a boycott questionnaire designed to elicit information about dealings with the boycotted country or blacklisted persons. The boycott questionnaire typically has no legitimate business purpose. It is intended to establish categories of eligibility for dealings with the boycotting country based on the subject's dealings with third parties. This provision prohibits the supply of that information in such a context." *Senate Report*, pp. 39–40.

The above plainly states Congress' meaning when it included the "intent" language in the statute. The plaintiffs maintain that answering a boycott questionnaire does not manifest intent to support the boycott if the person supplying the information does not agree with the boycott and does not intend to abide by it. However, I believe that Congress viewed answering a questionnaire from the boycott office as acting with intent "to comply with the boycott" by supplying the boycott officials with information. The regulations promulgated are consistent with Congress' meaning and the statute enacted. The committee report also states:

"Intent to comply with a boycott could be presumed, subject to rebuttal, where from all the circumstances it is reasonably clear that the information is sought for boycott enforcement purposes. The questionnaire, which on its face, or in the circumstances in which it is supplied, is designed only to elicit information about whether one has dealings with blacklisted persons or boycotted countries presents the clearest case. On the other hand where the information is sought in a con-

text which does not make it reasonably clear that the purpose is boycott related, no illegal intent should be presumed. In a specific case, all the facts and circumstances, including ordinary commercial practice, would govern." *Senate Report,* p. 40.

The plaintiffs argue that the effect of the regulations on intent is at odds with the premises of the act. The anti-boycott provisions amended the Export Administration Act; the plaintiffs argue that the overall act stresses the importance of United States exports. To that end, the President must, prior to the imposition of export controls for foreign policy or national security purposes, consider whether the same goods are available from foreign suppliers; if they are, the President must specifically find that the controls are necessary. 50 U.S.C. App. § 2403(c); *see* 50 U.S.C.App. §§ 2404(f) and 2405(g).

While the promotion of the export of American goods is certainly one goal of the EAA, it is not the only one. Congress included a detailed "declaration of policy" in the act. 50 U.S.C.App. § 2402. Congress stated that it is the policy of the United States

"... to encourage and, in specified cases, require United States persons engaged in the export of goods or technology or other information to refuse to take actions, including furnishing information or entering into or implementing agreements, which have the effect of furthering or supporting the restrictive trade practices or boycotts fostered or imposed by any foreign country against a country friendly to the United States or against any United States person." 50 U.S.C.App. § 2402(5)(B).

The Commerce Department regulations are consistent with this express policy to require persons to refuse to furnish information which would have the effect of furthering a boycott against a nation friendly to the United States. Thus the regulations are not inconsistent with the policies of the act.

■ The plaintiffs argue that the regulations state a conclusive presumption of intent which violates the principle that the government must prove every element of a criminal offense beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). When intent is an element of the crime charged, its existence is a question left to the trier of fact. *Morissette v. United States,* 342 U.S. 246, 274, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952).

■ The government argues that the plaintiffs lack standing to raise this issue because "Briggs has not alleged that it is being criminally prosecuted by the Government for violating the Act, or that it has been threatened with criminal prosecution." Government's brief, filed November 4, 1981, p. 26. The parties have stipulated that if Briggs answered the questionnaire it would violate the regulations and that the defendants would seek to impose sanctions. Stipulation, ¶ 14, quoted *ante.* The parties have also stipulated: "Briggs believes it is necessary to and desires to answer and would answer the [questionnaire] if it were not that it fears being subjected to the penalties set forth in [50 U.S.C.App. § 2410]." Stipulation, ¶ 16. These sanctions include criminal and administrative penalties. I believe that the stipulated facts present a sufficient threat of prosecution to render the above argument of the government groundless. *See Craig v. Boren,* 429 U.S. 190, 192–97, 97 S.Ct. 451, 454–56, 50 L.Ed.2d 397 (1976); *Steffel v. Thompson,* 415 U.S. 452, 458–60, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974).

However, more is required than a threat of prosecution. The plaintiffs challenge the regulations' presumption of intent. The Supreme Court has stated:

"Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime—that is, an 'ultimate' or 'elemental' fact—from the existence of one or more 'evidentiary' or 'basic' facts. The value of these evidentiary devices, and their validity under the Due

Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt." *Ulster County Court v. Allen,* 442 U.S. 140, 156 [99 S.Ct. 2213, 2224, 60 L.Ed.2d 777] (1979) (citations omitted).

The Court also stated that a litigant's standing to advance certain arguments depends on the nature of the presumption challenged. *Id.*

■ There are several types of presumptions, the constitutionality of which differs depending on the burden they place on the defendant. *See Ulster County Court, supra,* at 157–60, 99 S.Ct. at 2224–26; *Sandstrom v. Montana,* 442 U.S. 510, 517–19, 99 S.Ct. 2450, 2455–56, 61 L.Ed.2d 39 (1979). The analysis of a presumption's validity can turn on the inclusion of even a few prefatory words affecting the defendant's burden. *Compare Sandstrom, supra, with Pigee v. Israel,* 670 F.2d 690 (7th Cir. 1982). In assessing the type of presumption involved, "the jury instructions will generally be controlling, although their interpretation may require recourse to the statute involved and the cases decided under it." *Ulster County Court, supra,* at 157–59 n. 16, 99 S.Ct. at 2224–26 n.16. The Court in *Ulster County Court* in affirming the use of a presumption closely analyzed how the presumption was presented to the jury. *Id.* at 160–63, 99 S.Ct. at 2226–27.

Viewed in this light, the issue is less whether Briggs has standing, but whether analysis of the presumption is premature at this time. The presumption has not been presented to any factfinder as part of a case to be decided. There is no record of jury instructions or other matters to evaluate whether the presumption was presented in the form of a conclusory, mandatory, or permissive presumption. Such a record is crucial in evaluating the constitutionality of the presumption. I believe that this record is not sufficiently developed to conduct the analysis adequately.

The question is complicated by the presence of administrative sanctions, however. It may be that the administrative process will apply the presumption as stated, without any further embellishment. Thus there would be no further record. Given this possibility, and in the interest of judicial economy, I will address the issue of the constitutionality of the presumption as it now stands.

Much of the regulation on intent is simply a modified version of the jury instruction on intent that is frequently used in the federal courts. *See Devitt & Blackmar,* Federal Jury Practice and Instructions, § 14.13. The plaintiffs primarily object to section 369.1(e)(5) (quoted above). That portion first states that the reason or purpose of the accused "can be proved by circumstantial evidence." It then follows with an example of how that reason or purpose can be inferred. The elemental act, intent to comply with a boycott, is presumed from proof of the basic fact, knowingly supplying information in response to a request to supply boycott information prohibited by the act. The fact that the supplier of the information does not otherwise agree with the boycott is "irrelevant."

I believe that this presumption is proper. The regulation fulfills the congressional purpose to prohibit the flow of information to boycott authorities. I also find rational a presumption of intent to comply with a boycott from proof that the informant knowingly supplied prohibited boycott information, knowing it was sought for boycott purposes. *See Ulster County Court, supra,* at 163–67, 99 S.Ct. at 2227–29. In that regard, the presumption is not unlike other presumptions found in the federal jury instructions. *See Devitt & Blackmar,* § 31.07 (intent to avoid prosecution); § 52.-

09 (specific intent to pass counterfeit money); § 56.07 (intent and motive in Hobbs Act violations). Section 369.1(e)(7) requires consideration of all available evidence; juries are similarly instructed regarding the good faith belief of one accused of income tax evasion. *Devitt & Blackmar*, § 35.12. I do not believe the presumption places an improper burden on one charged with violating the act. Accordingly, I reject the plaintiffs' contention that the regulation's presumption of intent is unconstitutional.

### III. THE RATIONALITY OF THE REGULATORY SCHEME

■ The plaintiffs contend that the Commerce Department regulations are irrational as they apply to Briggs and therefore void. Briggs argues that the boycott authorities send out questionnaires haphazardly and seek information that either is not useful or is readily available from public sources. Briggs maintains that once a company fails to answer an inquiry, the boycott authorities consider whether that firm's products are readily available from other sources. If they are, the company is blacklisted. Thus Briggs argues that by prohibiting answers to such inquiries, the Commerce Department has simplified the task of the boycotters and shifted commerce to foreign competitors. Briggs argues that this is irrational.

The government argues that the regulations prohibiting the furnishing of information cannot be viewed in isolation. As the *Senate Report* states:

"[T]he committee strongly believes that the United States should not acquiesce in attempts by foreign governments through secondary and tertiary boycotts to embroil American citizens in their battles against others by forcing them to participate in actions which are repugnant to American values and traditions. Accordingly, the bill reported by the committee directly attacks attempts to interfere with American affairs while creating mechanisms for more subtle and flexible pressure against the other dimensions of foreign boycotts." *Id.* at 21.

A major provision of the act is the "refusal to deal" section, 50 U.S.C.App. § 2407(a)(1)(A), which authorizes the issuance of regulations prohibiting Americans from intentionally refusing to do business with entities associated with boycotted countries. Congress intended the prohibition on passing information to reinforce this provision and others.

"The prohibition on furnishing information about another person's race, religion, sex, or national origin would reinforce the anti-discrimination provisions of the bill. Similarly, the prohibition on furnishing information about who does and proposes to do business with a boycotted country or blacklisted person would bolster the refusal to deal provisions of the bill. Both are necessary to prevent a boycotting country from using U.S. persons to supply information necessary to boycott enforcement." *Senate Report*, p. 25.

Questionnaires such as that received by Briggs were a major focus of Congress' prohibition on the passing of information. *See Senate Report*, pp. 39–40 (quoted *ante*).

Congress recognized that the information sought would often be available from other sources, but it determined that the prohibition should include such matters.

"Such information may very well be available through other sources, including information innocently supplied by U.S. firms in the course of ordinary business transactions. And in that regard the bill does explicitly permit the furnishing of normal business information in a commercial context.... But there is little justification for permitting U.S. persons to supply information when they know it is being sought for boycott enforcement purposes. To do so would be to sanction active complicity in boycott implementation." *Senate Report*, p. 25.

Considering this context, I cannot find the Commerce Department regulations to be an irrational implementation of the legislation. The regulations adequately translate Congress' concerns about cutting off the flow of information to boycotters. As a

result, Briggs did not answer a questionnaire from the boycott office, the only purpose of which was to seek information to aid the boycott effort. I believe that the regulations are "reasonably related to the purposes of the ... legislation." *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969). Accordingly, they do not violate the due process clause.

Briggs oversimplifies the case by arguing that failure to answer the questionnaire triggers a blacklisting. The parties have indeed stipulated that Briggs was blacklisted subsequent to its failure to answer the inquiry. Stipulation, ¶ 16. However, Briggs had a problem exporting to Syria prior to receiving the questionnaire, *see* stipulation, exh. B, and it has also been taken off of the blacklist, even though it has not answered the questionnaire. At the time of the stipulation, its products were being accepted throughout the nations of the Arab League. Stipulation, ¶ 18. Thus the effect of the regulations on American trade is not nearly so cut and dried as Briggs argues.

I also reject Briggs' argument that the regulations permit a firm to supply information in the absence of a questionnaire that it cannot supply if it gets one. Example (ix) following the intent regulation reads:

"U.S. company A is on boycotting country Y's blacklist. In an attempt to secure its removal from the blacklist, A wishes to supply to Y *information which demonstrates that A does at least as much business in Y and other countries engaged in a boycott of X as it does in X.* A intends to continue its business in X undiminished and in fact is exploring and intends to continue exploring an expansion of its activities in X without regard to Y's boycott.

"A may furnish the information, because in doing so it has no intent to comply with, further, or support Y's boycott." 15 C.F.R. § 369.1(e), Examples of Intent. (Emphasis added).

Briggs' interpretation of this example goes too far. The example merely permits a company on its own initiative to demonstrate non-discriminatory conduct. *See* 15 C.F.R. § 369.1(e), Note to the examples. Example (ix) cannot be read to condone a company unilaterally providing a variety of information to a boycott agency. For example, I believe that the regulations quite reasonably prohibit a company from currying favor with boycott officials by unilaterally telling them that it will not trade with the boycotted country.

## IV. THE PLAINTIFFS' NINTH AMENDMENT RIGHTS

 The totality of the plaintiffs' argument under the ninth amendment is:

"Briggs believes its fifth amendment right is well-recognized. However, should the Court find otherwise, Briggs' right to pursue its trade and profit from it is worthy of ninth amendment protection." Plaintiffs' brief, filed August 24, 1981, p. 21 n.4.

I am not persuaded by Briggs' argument under the fifth amendment. Similarly, I fail to perceive any merit to the above barebones assertion of ninth amendment protection.

## V. THE PLAINTIFFS' FREE SPEECH RIGHTS

 The plaintiffs contend that section 2407(a)(1)(D) violates the first amendment because it does not permit the plaintiffs to answer truthfully the boycott questionnaire. Briggs argues that the regulations against this flow of information restrict its commercial speech and thus are inconsistent with recently articulated first amendment principles regarding such speech.

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1826, 48 L.Ed.2d 346 (1976).

**1318**

Most, if not all, of the cases considering first amendment protections of commercial speech have considered various aspects of advertising. *See, e.g., Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *Central Hudson, supra; Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia Pharmacy Board, supra; Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). The Court has explained: "[P]eople will perceive their own best interests if only they are well enough informed, and ... the best means to that end is to open the channels of communication rather than to close them." *Virginia Pharmacy Board, supra,* 425 U.S. at 770, 96 S.Ct. at 1829.

The Court has not extended full first amendment protection to commercial speech.

"[O]ur decisions have recognized 'the "common-sense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.' The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson, supra,* 447 U.S. at 562–63 [100 S.Ct. at 2349–50], quoting *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 455–56 [98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444] (1978) (other citations omitted).

The Court has also recognized: "Because of the special character of commercial speech and the relative novelty of First Amendment protection for such speech, we act with caution in confronting First Amendment challenges to economic legislation that serves legitimate regulatory inter-

ests." *Friedman v. Rogers,* 440 U.S. 1, 10–11 n. 9, 99 S.Ct. 887, 894–895 n.9, 59 L.Ed.2d 100 (1979).

The claim to protected first amendment rights in the free flow of information seems out of place in the context of the instant suit. The plaintiffs do not challenge a statute that prohibits them from presenting the public with price and product information about the engines that Briggs produces; the statute is no bar to the free flow of business information to the purchasers of Briggs' products. "Nothing in this paragraph shall prohibit the furnishing of normal business information in a commercial context...." 50 U.S.C.App. § 2407(a)(1)(D); *see* 15 C.F.R. § 369.2(d)(3) & (4). Instead the legislation is designed to interrupt the flow of information to those who conduct an economic boycott against a nation friendly to the United States, a boycott of which Congress does not approve. In this context the admonition to be cautious about a first amendment claim must be heeded.

There are a variety of laws that prohibit the exchange of information in certain contexts. *See Ohralik, supra,* 436 U.S. at 456, 98 S.Ct. at 1918, and the cases cited therein. As *Ohralik* states:

"[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.* at 456 [98 S.Ct. at 1918].

Briggs contends that the Court has held that regulation of commercial speech must satisfy the four-part test of *Central Hudson.* The Court stated:

"If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction

must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." 447 U.S. at 564 [100 S.Ct. at 2350].

Briggs contends that its speech is not misleading and concerns lawful activity, since the act does not make boycotts unlawful. However, if responses to boycott questionnaires are "a subject only marginally affected with First Amendment concerns," then the "conduct is subject to regulation in furtherance of important state interests." *Ohralik, supra,* 436 U.S. at 459, 98 S.Ct. at 1920.

The state interest here is substantial, involving delicate foreign policy questions and the interest of the government in forestalling attempts by foreign governments to "embroil American citizens in their battles against others by forcing them to participate in actions which are repugnant to American values and traditions." *Senate Report,* p. 21. Congress concluded that supplying information to boycott authorities has no legitimate business purpose and should be prohibited. I find the governmental interests to be substantial and more than sufficient to outweigh the marginal applicability of the first amendment.

I will also address the latter two elements of the *Central Hudson* test. The regulations prohibit compliance with solicitations from boycott authorities. Thus the regulations prevent American companies from being used as agents of the boycotting countries, and the regulations also advance the stated interest in keeping Americans out of the boycott struggle. It may be that in some situations the regulations do not fully accomplish that goal, and the company will be blacklisted anyway. As I noted above, that result is not a foregone conclusion. What can be safely concluded, however, is that the rule has directly advanced the governmental interest by preventing information from flowing to the boycotters.

The legislation is not more restrictive than necessary. The statute carefully excludes from its reach information transmitted in the normal business context. 50 U.S. C.App. § 2407(a)(1)(D); *see* 15 C.F.R. § 369.2(d)(3) & (4). The act sets up a bright-line division between that type of speech and answers to inquiries from boycott officials. To attempt to parse the prohibitions to exclude answers that transmit information readily available elsewhere, or information that arguably is not useful to the boycotters would be a difficult, if not impossible, regulatory task. Substantial questions of interpretation immediately suggest themselves; the regulatory process would be vastly complicated, frustrating the governmental interest. I find that the distinctions made are reasonable and that the governmental interest would not be served by any more limited restrictions.

## VI. TAKING PROPERTY WITHOUT COMPENSATION

■ Briggs argues that because the regulations cause Briggs to be blacklisted, and thus affect its worldwide sales, the government has totally destroyed Briggs' rights to its foreign trade. Briggs likens the effect to a restriction on private property which " 'forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980), quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

In *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Supreme Court held that the denial of one traditional property right, where the others were not disturbed, did not always amount to a taking. In *Andrus,* there was no physical invasion or restraint on the property in question; the regulation only prohibited the sale of the property. The Court did not find dispositive the fact that the regulations prevented the most profitable use of the property.

**1320**

"When we review regulation, a reduction in the value of property is not necessarily equated with a taking. . . . [L]oss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." *Id.* at 66 [100 S.Ct. at 327] (citations omitted).

The reed is equally slender here. The regulations apply to all Americans equally. It is possible that they have a somewhat greater impact on Briggs than they do on others, but that does not constitute a taking. Briggs has lost some profits because it has lost some sales, but its property has not been seized or restrained by the government. There is no restriction by the challenged regulation on Briggs' efforts to export its products. In prohibiting Briggs from answering certain questions, the government has not taken Briggs' property in violation of the fifth amendment.

## VII. CONCLUSION

The defendants recently filed a motion with the Judicial Panel on Multidistrict Litigation, and notice of such filing was received by this court on May 7, 1982. No action has yet been taken by the panel, and thus there are applicable the provisions of Rule 16, Rules of Procedure for the Judicial on Multidistrict Litigation, as authorized by 28 U.S.C. § 1407(f), which provide that the mere pendency of such a motion does not affect either this court's jurisdiction or its pretrial proceedings.

The challenged regulations do not interpret the statute in a manner contrary to what Congress intended. While consideration of the presumption in the regulations is, arguably, premature at this juncture, I believe that the presumption is rational and not unconstitutional. I find the regulatory scheme as a whole to be rational. Also, I find no merit to the plaintiffs' perfunctory argument under the ninth amendment. In addition, I conclude that the regulations do not impermissibly abridge the plaintiffs' free speech rights. Finally, the government has not taken Briggs' property without compensation.

Therefore, IT IS ORDERED that the motion of the plaintiffs for summary judgment be and hereby is denied.

IT IS ALSO ORDERED that the defendants' motion for summary judgment be and hereby is granted.

IT IS FURTHER ORDERED that this action be and hereby is dismissed upon its merits.