**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**Robert E. MEYER,
Defendant, Appellant.**

**No. 88–1479.**

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1988.

Decided Dec. 28, 1988.

See also 808 F.2d 912.

Robert E. Meyer, pro se.

Rick Richmond, Appellate Staff, Civ. Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Frank L. McNamara, Jr., U.S. Atty., and John F. Cordes, Appellate Staff, Civ. Div., Dept. of Justice, were on brief, for plaintiff, appellee.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

COFFIN, Circuit Judge.

Appellant Robert Meyer is a Massachusetts lawyer charged with violating antiboycott regulations issued under the Export Administration Act, 50 U.S.C.App. §§ 2401–2420 (1969) (as amended), by completing, and failing to inform the Commerce Department about, a Saudi Arabia trademark registration form that asked whether his client had a business relationship with Israel. Appellant refused to pay a $5,000 civil fine, and the government then brought this suit to collect the penalty. The district court upheld the assessment, and we affirm.

We begin by relating the particulars of Meyer's alleged violation. In December 1977, in the course of assisting a client who sought to register a trademark in Saudi Arabia, Meyer received an Authorization of Agent form from a Saudi Arabian firm that processed applications for trademark registration in that country. The form included a section characterized in the cover letter as a "Creed Declaration." In relevant part, it stated:

I/We also hereby solemnly declare that this company has no relations with Israel, which would contradict the following boycott principles:

1. Establishment of a branch of the factory in Israel.

2. Establishment of assembling factory in Israel or presence of an agent who assembles the products of the company in Israel.

3. The availability of general agents or central offices for the Middle East in Israel.

4. Granting the right to use the company's name by Israeli companies.

5. Participation in Israeli factories or companies.

6. Rendering technical assistance to Israeli companies.

7. In case one of the promoters is an Israeli national.

In January 1978, Meyer mailed the completed form to the Saudi Arabian Embassy in Washington, D.C. The next month, in response to a request from the Embassy, Meyer attempted to obtain State Department notarization of the form through a Virginia associate. The State Department responded to the associate's request by explaining that it could not authenticate documents "relating to the Arab boycott of Israel," and it further stated that the law "prohibit[s] U.S. persons from providing certain boycott information." The Virginia lawyer later wrote to Meyer that he authenticated the form through the U.S. Arab Chamber of Commerce, "[a]fter failing to obtain authentication by the State Department because of the Arab boycott."

In April, Meyer wrote a letter to his client in which he described his efforts to obtain authentication of the form, explaining that one problem he encountered was "that the Department of State would not

* Of the Fifth Circuit, sitting by designation.

apply its Certificate because of the boycott provisions [and] that Saudi Arabia would not waive the boycott provisions." In September 1978, Meyer sent a copy of the completed form to the Saudi Arabian firm that had sent it to him.

Meyer received a letter from the firm in November, explaining that the form he submitted was unacceptable because it was not authenticated by the State Department. The letter added, however, that the Creed Declaration was no longer required, and it suggested that the change was made because Saudi Arabia recognized "that the United States State Department will not legalize any document which contains the Boycott provisions." A new form, without the declaration, was enclosed. Meyer sent the new form to his client, but he never received a reply from her. He therefore closed his file on this matter.

■ The statute under which Meyer was charged authorized the President to issue regulations prohibiting the furnishing of information about whether any person has a business relationship with a boycotted country when the information is given "with intent to comply with, further, or support" an unsanctioned foreign boycott. 50 U.S.C.App. § 2403–1a(a)(1)(D). This intent requirement was repeated, and elaborated on, in the regulations enacted under the statute. *See* 15 C.F.R. §§ 369.1(e), 369.2(d)(1), (5). The regulations also required certain persons receiving requests for such information to file a report with the Department of Commerce. 15 C.F.R. § 369.4.[1]

Meyer's primary argument is that he lacked the requisite intent to violate the statute and regulations. He claims that his sole purpose in transmitting the form containing the Creed Declaration was to secure a trademark registration for his client, and that nothing he did "either furnished any information or in any way had anything to do with any boycott." The purpose of the Declaration, he asserts, was "not to derive information or knowledge, but merely to exclude [those] unworthy" to obtain a trademark registration.

We disagree that Meyer's actions fell outside of the regulatory prohibition. Although an individual does not violate section 369.2(d) if he takes a prohibited action *inadvertently, see* 15 C.F.R. § 369.1(e)(3), the regulations expressly state that an individual who does an act "[knowing] that such action was required or requested for boycott reasons" will be deemed to have acted "with intent to comply with an unsanctioned foreign boycott." *Id.* at § 369.1(e)(6). The regulations spell out the significance of the intent requirement:

> (4) Intent in this context means the reason or purpose for one's behavior. It does not mean that one has to agree with the boycott in question or desire that it succeed or that it be furthered or supported. But it does mean that the reason why a particular prohibited action was taken must be established.

---

1. The statute and regulations involved in this case underwent changes during the period in which appellant was attempting to complete and verify the trademark application form. Until June 22, 1977, the relevant provision of the Export Administration Act provided only that it was United States policy "to encourage and request" certain domestic businesses to refuse to take any action that would further or support a boycott imposed on a country friendly to the United States. 50 U.S.C.App. § 2402(5)(B). The statute was then amended to direct the President to issue regulations prohibiting any United States person from taking such actions. 50 U.S.C.App. § 2403–1a(a)(1)(D).

In compliance with the amended act, new regulations went into effect on January 18, 1978 expressly prohibiting any United States person from "furnish[ing] or knowingly agree[ing] to furnish information concerning his or any other person's past, present or proposed business relationships ... with or in a boycotted country" when those actions were taken with the intent described in the text above. 15 C.F.R. § 369.2(d)(1), (5).

The reporting requirement was changed on August 1, 1978, extending coverage to any United States person. Before that date, only exporters and "related service organization[s]" were required to report requests for boycott-related information.

Our references and citations are to the statute and regulations as they existed in January 1978 including, with regard to the reporting requirement, the regulation in effect before August 1, 1978.

(5) Reason or purpose can be proved by circumstantial evidence. For example, if a person receives a request to supply certain boycott information, the furnishing of which is prohibited by this Part, and he knowingly supplies that information in response, he clearly intends to comply with that boycott request. It is irrelevant that he may disagree with or object to the boycott itself. Information will be deemed to be furnished with the requisite intent if the person furnishing the information knows that it was sought for boycott purposes.

15 C.F.R. § 369.1(e)(4), (5). Included in the regulations are "Examples of 'Intent,'" one of which resembles the circumstances of this case:

(viii) A, a U.S. chemical manufacturer, receives a "boycott questionnaire" from boycotting country Y asking, among other things, whether A has any plants located in boycotted country X. A, which has never supported Y's boycott of X, responds to Y's questionnaire, indicating affirmatively that it does have plants in X and that it intends to continue to have plants in X.

A's responding to Y's questionnaire is deemed to be action with intent to comply with Y's boycott, because A knows that the questionnaire is boycott-related. It is irrelevant that A does not also wish to support Y's boycott.

In addition, an example in the section of the regulations discussing what it means to furnish information about business relationships is strikingly similar to this case, and illustrates that appellant's completion of the Creed Declaration was prohibited.

(xvii) U.S. company A, a manufacturer of certain patented products, desires to register its patents in boycotting country Y. A receives a power of attorney form required to register its patents. The form contains a question regarding A's business relationships with or in boycotted country X. A has no business relationships with X and knows or has reason to know that the information is sought for boycott reasons.

A may not answer the question, because A would be furnishing information about its business relationships with or in a boycotted country.

15 C.F.R. § 369.2(d).

There is no doubt that Meyer knew that the Creed Declaration was boycott-related. The document expressly asked for a declaration that the company had no relationship with Israel that would "contradict ... boycott principles." If he somehow failed to notice the language on the form when he received it, his Virginia associate's letter explaining the State Department's refusal to authenticate the form certainly brought the boycott issue directly to his attention. Indeed, when appellant wrote to his client in April 1978, he referred to the "boycott provisions" in the document.

■ In light of Meyer's obvious awareness of the Creed Declaration, appellant can not contend that he inadvertently violated the regulations when he arranged for completion of the form and transmitted it, thus fulfilling Saudi Arabia's boycott requirements. Instead, appellant emphasizes the district court's finding "that at no time did he consciously intend to violate the laws of the United States or any applicable regulations established by the commerce department." We find no fault with this conclusion, but—as the district court recognized—it does not help appellant. The maxim that ignorance of the law is no excuse is fully applicable here. Appellant sent the application form to Saudi Arabian officials with full awareness that it contained a signed declaration that his client did no business with Israel. In so doing, he intentionally complied with Saudi Arabia's boycott of Israel. That he had no intent to break the law does not erase the fact that he did so.[2]

---

**2.** Appellant does not appear to contend that the interpretation of intent contained in the regulations is inconsistent with either the statutory language or Congress' intent in enacting the legislation. To the extent his brief could be viewed as making such an argument, we reject it. *See Briggs & Stratton Corp. v. Baldrige,* 539 F.Supp. 1307, 1312–14 (E.D.Wis.1982), *aff'd,* 728 F.2d 915 (7th Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984).

■ We touch briefly on appellant's other arguments. He suggests that the revised regulations that went into effect in 1978 should not apply to him because he received the trademark application form and began processing it before that time. Most of Meyer's efforts to authenticate and submit the document occurred in 1978, however, and he therefore violated the new regulations.

■ As to the reporting requirement, the Administrative Law Judge found a violation in Meyer's failure to report the original receipt of the form in December 1977. At that time, the reporting regulation applied to exporters and related service organizations. According to the regulation, "related service organization[s]" include, but are not limited to, banks, insurers, freight forwarders, and shipping companies. 15 C.F.R. § 369.4. The ALJ concluded that the language is broad enough to include a lawyer assisting a client in registering a trademark, and we agree. Appellant's client sought trademark protection in Saudi Arabia in preparation for selling products there, and appellant's function was, in essence, to facilitate the export of his client's goods by arranging for the registration of the company's trademark. This was sufficient to bring him within the regulation.

■ Appellant also claims that he received inadequate notice of the regulations. He particularly criticizes the State Department for failing to warn him, through his Virginia associate, that he would be subject to sanctions if he pursued his attempt to file the application for a trademark registration. The government properly published these regulations in the Federal Register in January 1978, however, and appellant has suggested no reason why the government had any obligation to provide particularized notice to him. In fact, the State Department's response when it declined to authenticate the application form arguably put appellant on notice that he should look into the law "prohibit[ing] U.S. persons from providing certain boycott information." [3]

■ Finally, we find no merit in appellant's argument that applications for trademark registration are not covered by the statute and regulations at issue here.

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting.

If—and the if is not a very big one—the statute and the statutorily ordained regulations [1] call for the usually accepted standard of criminal intent, I would readily concur in Judge Coffin's excellent opinion for us.

### Intent:
### *More Than A Six Letter Word*

The trouble is, the statute with its legislatively mandated regulations, is quite to the contrary. In addition to 15 C.F.R. § 369.1(e)(4) and (5), quoted by the court,[2] there is subsection (3) which I regard as critical and critically distinctive:

(3) [i] Intent is a necessary element of any violation of this Part. [ii] It is *not sufficient* that *one take* action that is specifically prohibited by this Part. [iii] It is *essential* that one take such action *with intent* to *comply* with, *further*, or *support* an unsanctioned foreign boycott. Accord-

---

We note, in response to the dissent, our view that subsection (3) simply states the limitation that the statute and regulations do not apply to *inadvertent* actions in compliance with a boycott. We believe that subsection (5) and the "Examples of 'Intent'" demonstrate that the intent requirement is met so long as the actor complies with a request for information with knowledge that the request is boycott-related. We therefore disagree that the principle of *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) is applicable here.

**3.** We recognize that appellant's associate in Virginia did not send the State Department's letter to him, but the associate did alert appellant to a boycott-related problem. At least the decision not to pursue the issue further—if not also the neglect of his associate—is attributable to appellant.

**1.** *See* the Court's opinion, n. 1 and related text.

**2.** *See* the Court's opinion at p. 218.

ingly, a person who inadvertently, [iv] *without boycott intent,* takes a prohibited action, does not commit any violation of this Part.

(Emphasis and bracketed numbers added.)

It is here where the words of the District Judge, the words of the Congressionally mandated regulations and the words of the Supreme Court coalesce to compel a result of reversal, not affirmance.

The trial judge plainly stated:

at no time did he [Meyer] *consciously intend to violate the laws* of the United States or any applicable regulations established by the Commmerce Department.[3]

The Court in reaching affirmance reads these words to be nothing, or little more, than a paraphrasing of the usual rule that although Meyer did not consciously feel that he was violating the law, he did know that (i) he was doing the acts and that (ii) the law charges him with realizing that these acts were in violation of law.

The Supreme Court's word comes in *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

To be sure, *Liparota* did not deal with the anti-boycott law. Rather, it dealt with a prosaic, not very spectacular situation of a crimeless crime that condemns one who "knowingly uses, transfers ... or possesses coupons [food stamps] ... in any manner non-authorized by [the statute] or the regulations." 7 U.S.C. § 2024(b)(1).

As the Supreme Court points out, "[i]n submitting the case to the jury, the District Court rejected petitioner's proposed 'specific intent' instruction."[4] Concluding that this was not a "specific intent crime," the trial court charged:

When the word 'knowingly' is used ..., it means that the Defendant realized what he was doing, and was aware of the nature of his conduct, and did not act through ignorance, mistake, or accident.

---

3. *See* Court's opinion p. 219 (emphasis added).

4. The Court continued "[this] would have instructed the jury that the Government must prove that 'the defendants knowingly did an act

*Liparota v. United States,* 471 U.S. at 422, 105 S.Ct. at 2086, 85 L.Ed.2d at 438 (footnote omitted).

To the further instruction that the Government had to prove that " 'the Defendant acquired and possessed food stamp coupons for cash in a manner not authorized by the federal statute or regulations[,]' " the Defendant objected that this instruction "required the jury to find merely that he knew that he was acquiring or possessing food stamps." *Id.* at 422, 105 S.Ct. at 2086, 85 L.Ed.2d at 438. To the contrary, he argued "the statute should be construed instead to reach only 'people who *knew that they were acting unlawfully.*' " *Id.* at 422–23, 105 S.Ct. at 2086, 85 L.Ed.2d at 438 (emphasis added).

Reviewing the Seventh Circuit's affirmance, 735 F.2d 1044 (1984), the Court stated, "[t]he controversy between the parties concerns the mental state, if any, that the Government must show in proving that petitioner acted 'in any manner not authorized by [the statute] or the regulations.' " *Id.* 471 U.S. at 423, 105 S.Ct. at 2087, 85 L.Ed.2d at 438.

The controversy was sharply divided. The Government contended that the Defendant "violated the statute if [i] he knew that he acquired or possessed food stamps and if [ii] in fact that acquisition or possession was in a manner not authorized by statute or regulations.... According to the Government, no mens rea or 'evil-meaning mind' is necessary." *Id.* at 423, 105 S.Ct. at 2087, 85 L.Ed.2d at 438–39 (citation omitted) (bracketed numbers added).

To the contrary, the Defendant contended "that the Government's interpretation, by dispensing with mens rea, dispenses with the only morally blameworthy element in the definition of the crime ... [and,] an individual violates the statute [only] if he knows that he has acquired ... food stamps *and* if he also knows that he has done so in an unauthorized manner." *Id.*

which the law forbids, purposely intending to violate the law.' " *Liparota v. United States,* 471 U.S. 419, 422, 105 S.Ct. 2084, 2086, 85 L.Ed.2d 434, 438 (1985).

at 423, 105 S.Ct. at 2087, 85 L.Ed.2d at 439 (footnote omitted).

Recognizing that the elements of the crime (including the mental element) is one for Congressional determination and, hence, a judicial problem of statutory interpretation, the Court made this critical determination:

"[W]e believe that [the statute] requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations." *Id.* at 425, 105 S.Ct. at 2088, 85 L.Ed.2d at 440 (footnote omitted).

The upshot was that the "rule of lenity"[5] directly supports the Defendant's contention that to convict him under the statute the Government must prove that the defendant knew that what he was doing was in violation of the law. In the Court's words, "the Government must prove knowledge of illegality" for conviction. *Id.* 471 U.S. at 427–28, 105 S.Ct. at 2089, 85 L.Ed. 2d at 441. The Court concluded:

We hold that in a prosecution for violation of [the Food Stamp Act] the Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations.

*Id.* at 433, 105 S.Ct. at 2092, 85 L.Ed.2d at 445 (footnote omitted).

The upshot is that the Court holds that where Congress or its specifically directed agency defines the crime in words requiring a consciousness of illegal action, the Government must sustain this burden to substantiate a verdict (finding) of guilty.

Subsection (3) of the Congressionally-mandated regulations on intent makes the principle of *Liparota* applicable to the anti-boycott provisions. Sentence [ii] of 15 C.F.R. § 369.1(e)(3) affirmatively states what is and is not sufficient to constitute a violation. What is not sufficient to constitute a violation is specifically a shorthand statement that negatively states the usual formulation that one intends the natural consequences of his/her acts. This is highlighted by sentence [iii] which makes it *essential* that the acts are performed with a specific purpose, intent to comply with, that is help carry out, a forbidden boycott. The affirmative statement in [iii] at the same time negatives the usual rule that one need only intend to do the act, i.e. mail the letter, etc. Finally, under sentence [iv] a person who "takes" any action which would be prohibited under the Act does not commit a "violation of this" Act unless he does so with a boycott intent.

In the light of *Liparota,* all of the § 369.1(e)(3) ingredients require that a person accused of anti-boycott violations must *consciously* be aware that what he is doing is in violation of the Anti–Boycott Act.

### From Food Stamps To Trademark Registration

What was it that the misguided Meyer did here? As to any of these things is there a finding that he *consciously* knew that what he was doing was in violation of the anti-boycott provisions? First, Meyer received the Authorization of Agent Form which contained the Creed Declaration section. Next, Meyer completed the form and then mailed the completed form to the Saudi Arabian Embassy. Upon the Embassy's request, Meyer attempted, through a Virginia associate, to obtain State Department notarization. The State Department declined to notarize the document on the grounds that it could not authenticate documents "relating to the Arab Boycott of Israel" and United States law "prohibits U.S. persons from providing certain boycott information." Meyer's Virginia associate then obtained United States Arab Chamber of Commerce notarization, as he explained to Meyer, "[a]fter failing to ob-

---

5. The rule of lenity is the "general injunction that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *United States v. United States Gypsum Co.,* 438 U.S. 422, 437, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854, 869 (1978) (quoting *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493, 497 (1971)). This lenity is reflected in the Court's "generally inhospitable attitude" to strict liability offenses and its hesitancy to interpret Congressional silence on requisite intent as a directive that a strict liability standard was intended. *Id.* 438 U.S. at 437–38, 98 S.Ct. at 2874, 57 L.Ed.2d at 869–70.

tain authentication by the State Department because of the Arab boycott."

Next, Meyer advised his client of the notarization difficulties, specifically stating "that the Department of Commerce would not apply its Certificate because of the boycott provisions [and] that Saudi Arabia would not waive the boycott provisions." Finally, Meyer sent the Authorization of Agent Form to the Saudi Arabian firm which processes trademark applications.

Indulgent, as we must be to the trier's finding of guilt, the question remains: were any of these acts done by Attorney Meyer with a *consciousness* that they were illegal? The test for determining whether the finding of guilt can stand is whether there was sufficient evidence to establish beyond a reasonable doubt that the acts done by Attorney Meyer were done with a *consciousness* that they violated the anti-boycott statute. In words which could not have been plainer or clearer or more selective, the trial judge, as the trier, answered emphatically:

> ... at no time did he [Meyer] *consciously* intend to violate the laws of the United States or any applicable regulations established by the Commerce Department.

(Emphasis added.)

The anti-boycott statute construed as it must be in the light of *Liparota* requires the Government to prove that one charged with violations of the anti-boycott statute *consciously* did the acts knowing that they were a violation of the statute.

The Court's findings of liability for the administratively imposed penalty being based on the usual standards of mens rea and not the *Liparota* standard of *consciousness* of violation of the law cannot stand.

The judgment should be reversed with directions to dismiss or, at a minimum, reversed and remanded for consideration in the light of the proper legal standards.