### The TRANE COMPANY, et al., Plaintiffs,

v.

### Malcolm BALDRIGE, Secretary of the United States Department of Commerce, et al., Defendants.

No. 78–C–413.

United States District Court, W.D. Wisconsin.

Jan. 4, 1983.

Brice M. Clagett, John L. Ellicott, Gary R. Roberts, Daniel B. Magraw, John J. McKetta, III, Covington & Burling, Washington, D.C., for plaintiffs.

Neil H. Koslowe, Sp. Litigation Counsel, Laurie Bennett, Atty., Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

This is the second of two "Arab boycott" cases to come before the federal courts in Wisconsin. On May 10, 1982, Judge Gordon granted the defendants' motion for summary judgment in *Briggs & Stratton Corp. v. Baldrige,* 539 F.Supp. 1307 (E.D.Wis.1982), upholding the validity of certain provisions of the Export Administration Act of 1979, 50 U.S.C.App. § 2401 *et seq.,* and certain regulations which make it unlawful "to comply with, further, or support any boycott fostered or imposed by a foreign country against a country which is friendly to the United States ...." 50 U.S.C.App. § 2407(a)(1). The instant case presents another challenge to the same legislation. The plaintiffs contend that portions of the act and regulations violate the First, Fifth, and Ninth Amendments of the United States Constitution. Accordingly, they seek an order declaring the challenged legislation unconstitutional and enjoining the defendants from enforcing its prohibition against them. The parties have stipulated to a statement of facts and have fully briefed cross-motions for summary judgment. For the reasons indicated below, the Court will grant defendants' motion for summary judgment.

## I. BACKGROUND

The following factual summary is based primarily upon the Stipulation of Facts which was filed by the parties on March 31, 1982 and which the Court now adopts as part of its findings of fact.

Plaintiff, The Trane Company (Trane), is a Wisconsin corporation engaged in the manufacture of air conditioning, refrigeration, and heat transfer equipment. It does a substantial amount of business with various nations which are members of the League of Arab States. (Stip. ¶ 1.) Plaintiff Maurice Bouchard is the Vice-President, Southern Hemisphere and Middle East, for Trane. (Stip. ¶ 5.) Plaintiff United Technologies Corporation (UTC) is a Delaware Corporation engaged in the manufacture of jet engines, helicopters, elevators and escalators, air conditioning equipment, and other products within three principal lines of business—power, flight systems, and industrial products and service. UTC also does a substantial amount of business with Arab League countries. (Stip. ¶ 6.) Plaintiff Nicholas Tomassetti is Vice-President, Marketing and Customer Support, of the Power Group/Commercial Products Division of UTC, having responsibility for the Middle East and Africa Region. (Stip. ¶ 6.)

The League of Arab States is composed of 21 Arab states. On December 11, 1954, its council passed a resolution calling for an economic boycott of the State of Israel. (Stip. ¶ 7.) Sometime thereafter, the League formed an organization called the Central Boycott Office, whose purpose is to facilitate communications among the local boycott offices of the boycotting states, gather boycott-related information, investigate and administer certain aspects of the boycott, and make recommendations concerning firms or individuals that should be blacklisted by participating Arab states. (Stip. ¶ 7.) All Arab states that participate in the boycott of Israel represent that their boycott activities are governed by a document entitled "General Principles for Boycott of Israel." Each state, however, retains sovereign rights over boycott activities. In a significant number of cases, these states have not followed the provisions of the document. (Stip. ¶ 8.)

The Arab boycott of Israel occurs on three levels. The "primary boycott" involves a refusal by the governments of the participating countries to deal, and a prohibition on their residents from dealing, directly with, or in the goods of, Israel or Israeli firms. The primary boycott is enforced by 16 Arab states. (Stip. ¶ 9.) The "secondary boycott" involves a refusal by the governments of participating Arab states to deal, and a prohibition on their residents from dealing, with persons or firms, or in the goods or services of persons or firms, which, although not Israeli, have been "blacklisted" by boycott officials of these Arab states. (Stip. ¶ 10.) The "tertiary boycott" involves a requirement by participating governments that persons or firms not deal with blacklisted firms in certain circumstances. The secondary and tertiary aspects of the boycott are enforced in varying degrees in 13 Arab states. (Stip. ¶ 10.)

Generally, decisions to blacklist a firm or person originate with local boycott authorities in one of the 13 Arab states participating in the secondary or tertiary aspects of the boycott, although they may originate with the Central Boycott Office. An investigation by a local boycott office may arise as a result of information indicating the target firm or person may not be in conformance with the document entitled "General Principles for the Boycott of Israel," or it may arise for no ascertainable reason. If a local boycott office is not satisfied as to the target's compliance with the "General Principles," it may blacklist or warn the target, direct other governmental agencies in the country not to deal with the target, and/or propose that the Central Boycott Office recommend that the target be blacklisted by the 13 Arab states enforcing the secondary and tertiary boycotts. It may, however, take no action whatsoever. (Stip. ¶ 11.)

As a means of gathering boycott-related information, the local boycott office in an Arab state may send a questionnaire to a target seeking formal written responses as to the target's business affiliations, relationships with Israel, relationships with blacklisted persons or firms, and other matters. Failure by a target to respond to such a questionnaire within the prescribed time period makes it more likely than not that the target will be blacklisted by the country sending the questionnaire and that the target will be recommended for blacklisting to the Central Boycott Office. (Stip. ¶ 12.) In the event a proposal for blacklisting is made to the Central Boycott Office, there is a reasonable likelihood that the Central Boycott Office will recommend that the persons or firms be blacklisted by all of the Arab states participating in the secondary and tertiary aspects of the boycott. In the event such a recommendation is made, it is more likely than not that a blacklisting of the target will occur in at least some of the participating Arab states. (Stip. ¶ 13.) In the event a person or firm is blacklisted, the "General Principles" provide that its products and services will be denied entry into the boycotting states. (Stip. ¶ 14.)

In the mid-1970's, Congress became concerned about Arab efforts to pressure American companies into participating in the boycott of Israel. Various examples of such pressure were cited. *See* S.Rep. No.

95–104, 95th Cong., 1st Sess. 16–18 (1978) (Senate Report); Subcomm. on Oversight and Investigations of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 2d Sess., *Report of the Arab Boycott and American Business,* 10–11, 41–42 (Subcomm. Print 1976). *Cf. Briggs, supra,* 539 F.Supp. at 1310. In 1977, Congress enacted anti-boycott legislation as an amendment to the Export Administration Act. Pub.L. No. 96–72, 93 Stat. 503 (codified at 50 U.S.C. App. § 2401 *et seq.* (Supp. III 1979)). The 1977 Amendments authorized the President to issue regulations making it a criminal offense for any "United States person" to take or agree to take certain boycott-related actions with respect to his activities in United States commerce. The Department of Commerce promulgated such regulations, which took effect on January 18, 1978. *See* 43 Fed.Reg. 3508 (1978). In 1979, the Export Administration Act extended the foreign-boycott provisions of the 1977 Amendments, with no changes effecting the present litigation. *See Trane Company v. Klutznick,* 87 F.R.D. 473, 474.

One of the provisions of the anti-boycott legislation, along with the implementing regulations promulgated by the Commerce Department, prohibits United States persons from intentionally complying with demands from foreign boycott officials for information in response to a boycott questionnaire. *See* 50 U.S.C.App. § 2407(a); 15 C.F.R. 369.2. The legislation does not prevent a United States person from providing information on its business operations to a boycotting country in a normal commercial context. *See* 15 C.F.R. § 369.2(d)(3). The restriction touches upon such information only if it would be furnished for boycott-related purposes through a questionnaire or otherwise. *See* 15 C.F.R. § 369.2(d)(4).

On July 19, 1978, plaintiffs Trane and Bouchard received a letter from their distributor in Kuwait enclosing a letter and questionnaire from the boycott office of the Kuwaiti government. The letter and questionnaire constitute an official request for information concerning Trane's business relationships and activities with respect to certain companies and with Israel or Israeli

firms. (Stip. ¶ 15.) The parties have agreed that Trane's and Bouchard's responding to the Kuwaiti questionnaire by furnishing the information sought is proscribed by the Commerce Department regulations which are the subject of this action. (Stip. ¶ 16.) Trane has requested the Kuwaiti boycott authorities to grant an indefinite extension of time in which to respond to the questionnaire pending the resolution of this lawsuit. There has been no official response to this request. Trane has not received notice that it has been blacklisted. (Stip. ¶ 17.)

On October 29, 1980, plaintiff UTC received a letter from the Central Boycott Office containing several questions which inquire about UTC's business relationships with Israel and Israeli firms and about what firms are owned by UTC or have ownership interests in UTC. (Stip. ¶ 19.) The parties have agreed that UTC's and Tomassetti's responding to the Central Boycott Office questionnaire by furnishing the information sought is proscribed by the Commerce Department's regulations challenged in this suit. UTC has not been notified whether it would be denied an indefinite extension of time in which to respond pending resolution of this suit. Neither has UTC been informed that it has been blacklisted. (Stip. ¶ 20.)

If called upon to testify, witnesses for Trane and Bouchard would testify that Trane officials have no knowledge of the reasons why the Kuwait boycott office submitted the questionnaire to Trane. (Stip. ¶ 18.) Witnesses for UTC and Tomassetti would likewise testify that UTC officials have no knowledge why UTC was selected by the Central Boycott Office to receive the questionnaire. (Stip. ¶ 21.) Witnesses for the plaintiffs would further testify that company officials believe that, if permitted to give responsive answers to the questionnaires (without otherwise violating the Export Administration Act and accompanying regulations), Trane and UTC would be able to avoid blacklisting. (Stip. ¶¶ 18, 21.) The parties have agreed that some of the information called for in the questionnaires is

publicly available from various sources. If the questionnaires were answered, Arab boycott officials would be able to satisfy their need, if any, for the requested information without the inconvenience of consulting public sources. (Stip. ¶ 23.)

The "General Principles for Boycott of Israel" provide that one of the bases for blacklisting is refusing to respond, within the period of warning, to a questionnaire which seeks to clarify a firm's position and determine its relationship with Israel. (Stip. ¶ 27.) If called upon to testify, witnesses for the plaintiffs would testify that Trane and UTC are fearful that their failure to respond to the questionnaires will result in their being blacklisted. (Stip. ¶ 29.)

Although it is impossible to predict with certainty what action a particular Arab state will take in any specific circumstances, the parties have agreed that the failure to answer an inquiry from an Arab boycott authority makes it more likely than not that the firm not responding will be blacklisted and have its products banned by one or more Arab state. (Stip. ¶ 29.) The parties also have agreed that, if either Trane or UTC is blacklisted by members of the Arab League in which the companies do business, it is more likely than not that the respective company's goods will be denied entry by the blacklisting members. Such action could adversely affect each company economically, adversely affect a portion of each company's workforce, and cause substantial personal, professional, and economic hardship for plaintiffs Bouchard and Tomassetti. (Stip. ¶¶ 30, 31.)

Commerce Department officials have advised Trane and UTC that, under the facts agreed to by the parties, responsive information furnished by Trane and UTC to the questionnaires received would contravene the Department's regulations which are being challenged in this suit. Department officials have also informed Trane and UTC that the defendants, four of the highest ranking government officials charged with enforcing the legislation (Stip. ¶¶ 32–35),

could, upon learning that any responsive information had been furnished by Trane or UTC or on their behalf, seek to impose one or more of the statutory penalties provided for such violations. (Stip. ¶ 22.)

The only part of the Export Administration Act which the plaintiffs challenge in this suit is that portion which prohibits any United States person from communicating information about its past or present business relationships with a boycotted country or with blacklisted firms or persons. That prohibition appears in Section 8(a)(1)(D) of the Export Administration Act of 1979, 50 U.S.C.App. § 2407(a)(1)(D):

(a)(1) For the purpose of implementing the policies set forth [herein] . . . the President shall issue regulations prohibiting any United States person, with respect to his activities in the interstate or foreign commerce of the United States, from taking or knowingly agreeing to take any of the following actions with intent to comply with, further, or support any boycott fostered or imposed by a foreign country against a country which is friendly to the United States and which is not of itself the object of any form of boycott pursuant to United States law or regulation:

(D) Furnishing information about whether any person has, has had, or proposes to have any business relationship (including a relationship by way of sale, purchase, legal or commercial representation, shipping, or other transport, insurance, investment or supply) with or in the boycotted country, with any business concern organized under the laws of the boycotted country, with any national or resident of the boycotted country, or with any other person which is known or believed to be restricted from having any business relationship with or in the boycotting country. Nothing in this paragraph shall prohibit the furnishing of normal business information in a commercial context as defined by the Secretary.

The plaintiffs also challenge that portion of the regulations promulgated by the Commerce Department to implement the above-quoted provision. *See* 15 C.F.R. § 369.2(d).[1]

In challenging the portions of the Act and regulations noted above, plaintiffs make essentially four arguments. First, they contend that the prohibition against responding to the Arab questionnaires suppresses their First Amendment right of free speech. Plaintiffs contend that, whether the proposed communications are characterized as traditional, non-commercial speech (which they contend is the correct analysis) or as commercial speech, the prohibition is invalid because it is not narrowly drawn to advance directly substantial governmental interests. Second, plaintiffs argue that the prohibition is invalid under the Due Process Clause of the Fifth Amendment because it is arbitrary and draws irrational distinctions, with the effect of unfairly placing enormous burdens on a few people, disproportionately to any legitimate governmental interests. Third, plaintiffs contend that the challenged prohibition violates their right to procedural due process under the Fifth Amendment because it places them in jeopardy of being deprived of substantial property interests without any opportunity to correct or otherwise respond to implicit misinformation in the questionnaires. Finally, plaintiffs assert that the prohibition violates the Ninth Amendment (as well as principles established under the First, Fifth, and Sixth Amendments) because it denies them their fundamental right to correct misapprehensions or otherwise provide facts about themselves, without advancing any compelling governmental interest which would warrant such a denial. The Court will address these arguments separately below.

1. The challenged portion of the regulations provides as follows:

(d) *Furnishing information about business relationships with boycotted countries or blacklisted persons.*

Prohibition Against Furnishing Information About Business Relationships With Boycotted Countries or Blacklisted Persons

(1) No United States person may furnish or knowingly agree to furnish information concerning his or any other person's past, present or proposed business relationships:

(i) With or in a boycotted country;

(ii) With any business concern organized under the laws of a boycotted country;

(iii) With any national or resident of a boycotted country; or

(iv) With any other person who is known or believed to be restricted from having any business relationship with or in a boycotting country.

(2) This prohibition shall apply:

(i) whether the information pertains to a business relationship involving a sale, purchase, or supply transaction; legal or commercial representation; shipping or other transportation transaction; insurance; investment; or any other type of business transaction or relationship; and

(ii) whether the information is directly or indirectly requested or is furnished on the initiative of the United States person.

(3) This prohibition does not apply to the furnishing of normal business information in a commercial context. Normal business information may relate to factors such as financial fitness, technical competence, or professional experience, and may be found in documents normally available to the public such as annual reports, disclosure statements concerning securities, catalogues, promotional brochures, and trade and business handbooks. Such information may also appear in specifications or statements of experience and qualifications.

(4) Normal business information furnished in a commercial context does not cease to be such simply because the party soliciting the information may be a boycotting country or a national or resident thereof. If the information is of a type which is generally sought for a legitimate business purpose (such as determining financial fitness, technical competence, or professional experience), the information may be furnished even if the information could be used, or without the knowledge of the person supplying the information is intended to be used, for boycott purposes. However, no information about business relationships with blacklisted persons or boycotted countries, their residents or nationals, may be furnished in response to a boycott request, even if the information is publicly available. Requests for such information form a boycott office will be presumed to be boycott-based.

(5) This prohibition, like all others, applies only with respect to a United States person's activities in the interstate or foreign commerce of the United States and only when such activities are undertaken with intent to comply with, further, or support an unsanctioned foreign boycott.

## II. FIRST AMENDMENT CHALLENGE

### A. *Traditional v. Commercial Speech*

Plaintiffs argue that the prohibition against their responding to the Arab questionnaires violates their right to free speech under the First Amendment. In so arguing, they contend that their proposed communications in response to the questionnaires are entitled to the full First Amendment protection afforded to "traditional speech" rather than the more limited protection given to "commercial speech," as those terms have been defined by the Supreme Court. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). *See, generally, Briggs, supra*, 539 F.Supp. at 1317–18.

The Supreme Court has recognized the distinction between commercial speech and traditional speech in a number of cases. In *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Court described commercial speech as that which does "no more than propose a commercial transaction." *Id.* at 762, 96 S.Ct. at 1825 (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973). *Accord, Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 562, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980); *Ohralik v. Ohio State Bar Ass'n, supra*, 436 U.S. at 455–56, 98 S.Ct. at 1918. In *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Court defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Id.* at 561, 100 S.Ct. at 2348 (citing *Virginia Pharmacy Bd., supra; Bates v. State Bar of Arizona*, 433 U.S. 350, 363–64, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977); *Friedman v. Rogers*, 440 U.S. 1, 11, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1979)).

*Accord, In re R.M.J.*, 455 U.S. 191, 204 n. 17, 102 S.Ct. 929, 938 n. 17, 71 L.Ed.2d 64 (1982).

Plaintiffs argue that the foregoing descriptions of commercial speech do not apply to the proposed communications at issue here. They contend that responses to the questionnaires would not "propose a commercial transaction," *Virginia Pharmacy Bd., supra.* Defendants agree that the information that would be contained in such responses would not in itself "propose a commercial transaction," but note that plaintiffs would have no occasion to even answer the questionnaires if it were not their desire to promote business with the Arab states. Plaintiffs also argue that the proposed communications here do not constitute "expression related solely to the economic interests of the speaker and its audience," *Central Hudson, supra*, because more than economic interests are at stake. They assert that the communications are necessary to promote the truth concerning their business relationships and to dispel any misapprehensions which the Arabs might have about them.

■ The Court cannot accept plaintiffs' argument. While it is true that responses to the questionnaires would not themselves "propose a commercial transaction," it is abundantly clear that plaintiffs' sole interest in providing responsive answers is economic. To the extent that the plaintiffs have an interest in promoting truth or dispelling misapprehensions, it is directly related to their ultimate interest in continuing to do business with the Arab states.[2] Judge Gordon reached a similar conclusion in denying the plaintiffs' motion for reconsideration in the *Briggs & Stratton Corp. v. Baldrige* case: "It is irresistibly obvious that the plaintiffs' responses to the questionnaires were calculated to further Briggs' business relations with certain countries rather than to enlighten the general

---

**2.** Plaintiffs contend, nonetheless, that speech may be considered "traditional" even when the underlying interests are economic. *See* Plaintiffs' Reply Mem. at 9. The Court is not persuaded that the cases cited by plaintiffs in support of this argument are sufficiently analogous to the instant case to justify a characterization of the communication at issue as "traditional."

public, or to edify society." 544 F.Supp. 667 at 668. The Court concludes, therefore, that plaintiffs' challenge to the prohibition against responding to the questionnaires must be considered in light of the First Amendment standards for commercial speech.

### B.  *Commercial Speech Standards*

Plaintiffs contend that, even when measured under First Amendment standards for commercial speech, the challenged prohibition is unconstitutional. This is so, argue plaintiffs, because the legislation does not directly advance substantial governmental interests and, even assuming it did, is more extensive than necessary to further such interests.

The test for determining the constitutionality of a governmental restraint on commercial speech was articulated by the Supreme Court in *Central Hudson, supra:*

> If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

447 U.S. at 564, 100 S.Ct. at 2350. The Court went on to explain the above-quoted passage as establishing a four-part analysis for First Amendment challenge to restrictions on commercial speech:

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. at 2351.

▮ In the instant case there is no issue regarding whether the prohibited communications are misleading or related to unlawful activity. The challenged prohibition is against *all* communications in response to the Arab questionnaires, and the plaintiffs seek only to provide truthful information. There are no state or federal laws (other than the portions of the Export Administration Act and regulations challenged here) that would make the proposed communications unlawful. (Stip. ¶ 23.) Neither is there anything unlawful about the underlying activity involved (trade with Arab nations) which would necessarily deprive the plaintiffs of First Amendment protection. *Cf. Pittsburgh Press, supra.* Thus, the Court must determine whether the challenged prohibition (1) seeks to implement a substantial governmental interest, (2) directly advances that interest, and (3) reaches no farther than necessary to accomplish that interest. *Central Hudson, supra; In re R.M.J., supra,* 455 U.S. at 191 n. 15, 102 S.Ct. at 937 n. 15.[3]

### 1.  *The Governmental Interest*

▮ The Court concludes that the governmental interest here is substantial, "involving delicate foreign policy questions and the interest of the government in forestalling attempts by foreign governments

---

**3.** The Court rejects defendants' argument that, because of the nature of the challenged prohibition, the First Amendment does not even apply

to plaintiffs' proposed communications. *See* Defendants' Mem. at 30–31.

to 'embroil American citizens in their battles against others by forcing them to participate in actions which are repugnant to American values and traditions.' " *Briggs, supra,* 539 F.Supp. at 1319 (quoting *Senate Report* p. 21). The statutory policy underlying the challenged prohibition is stated in 50 U.S.C.App. § 2402(5)(A):

> It is the policy of the United States ... to oppose restrictive trade practices or boycotts fostered or imposed .by foreign countries against other countries friendly to the United States or against any United States person.

Congress believed that to permit "U.S. persons to supply information when they know it is being sought for boycott enforcement purposes ... would be to sanction active complicity in boycott implementation." *Senate Report,* p. 25.

Plaintiffs argue that the asserted governmental interests are not substantial. They describe at length how the United States, like the Arab League states, has over the years employed its own boycott tactics in carrying out foreign policy. *See* Plaintiffs' Reply Mem. at 30–39. The short answer to plaintiffs' long argument is that whether or not the United States engages in similar boycott activities is simply not material to determining whether there is a substantial governmental interest underlying the challenged legislation. Plaintiffs also argue that the challenged legislation has nothing to do with American foreign policy. They contend that Congress passed the legislation merely as a response to domestic political pressures opposed to the Arab boycott. Whether this was, in fact, Congress' real motive in passing the 1977 Amendments is something which cannot be ascertained and which, as a matter of proper constitutional adjudication, should be disregarded. *See United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968).

In light of the statements regarding the purpose of the challenged legislation, noted both in the 1977 Amendments and the legis-

lative history, the Court concludes that there is, in fact, a substantial governmental interest underlying the challenged prohibition.[4]

### 2. *Advancement of Governmental Interest*

The Court concludes that the prohibition against responding to the Arab questionnaires directly advances the governmental interest of not allowing United States persons to become involved in perpetuating the Arab boycott of Israel. Although it is true that the prohibition cannot completely cut off the flow of information sought by the questionnaires (because some of the information is available publicly), the prohibition removes United States persons from the unseemly position of being forced to provide information used in the boycott of Israel. *Cf. Briggs, supra,* 539 F.Supp. at 1319. Moreover, the prohibition makes the gathering of such publicly-available information a more expensive and inconvenient task for the boycotters. (Stip. ¶ 23.) To this extent, the prohibition furthers the statutory policy of opposition to the boycott of a country friendly to the United States. *See* 50 U.S.C.App. § 2402(5)(A).

### 3. *Narrowly Drawn*

Plaintiffs contend that the challenged prohibition could have been more narrowly drawn to achieve the stated governmental interest. For example, they suggest that the prohibition could have been drafted so as to forbid affirmative responses (as opposed to denials) to the implicit allegations in the questionnaires that an American firm is engaged in conduct inconsistent with the boycott principles. This suggestion has only a simplistic appeal. If the prohibition were as stated above, boycott officials would be advised to impose sanctions only upon those firms which refuse to respond to questions. Plaintiffs also suggest that the prohibition could have been drafted to prohibit the supplying of information which is not readily available from public sources within the United States. Yet, as previous-

---

4. In reaching this conclusion, the Court relies not only upon the portions of the legislative history quoted in the text, but also upon vari-

ous other passages which are specifically noted in defendants' brief. *See* Defendants' Mem. at 31–33.

ly noted, the use of questionnaires makes it easier for boycott officials to gather boycott-related information through the cooperative efforts of American firms. Thus, the prohibition against responding to the questionnaires even with publicly-available information advances the stated governmental interest. The Court concludes, therefore, that the challenged prohibition is not more extensive than is necessary to serve the stated governmental interest.[5]

For the reasons indicated above, the Court holds that the challenged portions of the statute and regulation do not violate plaintiffs' First Amendment rights.

## III. SUBSTANTIVE DUE PROCESS CHALLENGE

Plaintiffs argue that their right to due process under the Fifth Amendment is violated because the challenged prohibition is arbitrary and unreasonable, placing an unfair burden on certain persons disproportionately to any legitimate governmental interest.

■ The Due Process Clause of the Fifth Amendment affords protection against arbitrary and irrational governmental action. *See, e.g., Moore v. City of East Cleveland,* 431 U.S. 494, 498 n. 6, 97 S.Ct. 1932, 1935 n. 6, 52 L.Ed.2d 531 (1977); *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947, 958 (7th Cir.1979), *aff'd* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). In determining whether an act of Congress infringes upon substantive due process rights, the Court must look upon "whether the legislation represents a rational means to a legitimate end."

*Nachman, supra,* 592 F.2d at 960. The Court must keep in mind that the challenged law "need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). Moreover, there is a presumption favoring the judgment of the legislature as to the necessity and reasonableness of a particular measure.[6] *Nachman, supra,* 592 F.2d at 963.

In *Nachman, supra,* the Seventh Circuit noted that "[r]ationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem." 592 F.2d at 960. The Court set forth several factors to be considered in evaluating the nature and scope of the burden. Those factors include: the interests of the parties affected; whether the impairment of the private interest is effected in an area previously subjected to regulatory control; the equities of imposing the legislative burdens; and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. *Id.* In *Beller v. Middendorf,* 632 F.2d 788 (9th Cir.1980), *cert. denied,* 452 U.S. 902, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981), the Ninth Circuit stated the factors to be considered another way: "[S]ubstantive due process scrutiny of a government regulation involves a case-by-case balancing of the nature of the individual interest allegedly infringed, the importance of the government interests fur-

---

**5.** In this regard, the Court also finds persuasive the reasoning set forth by Judge Gordon in *Briggs, supra:*

> To attempt to parse the prohibitions to exclude answers that transmit information readily available elsewhere, or information that arguably is not useful to the boycotters would be a difficult, if not impossible, regulatory task. Substantial questions of interpretation immediately suggest themselves; the regulatory process would be vastly complicated, frustrating the governmental interest. 539 F.Supp. at 1319.

**6.** Plaintiffs argue that the presumption of constitutionality which is normally associated with acts of Congress does not exist in the instant case because of the unusually determinative role played by private lobbyists and interest groups in the formulation of the anti-boycott provisions. *See* Plaintiffs' Reply Mem. at 62. As the Court has previously indicated in Part II B, *supra,* however, proper constitutional analysis does not allow for such speculation concerning Congress' motive in enacting the legislation. *See United States v. O'Brien, supra,* 391 U.S. at 383, 88 S.Ct. at 1682.

thered, the degree of infringement, and the sensitivity of the government entity responsible for the regulation to more carefully tailored alternative means of achieving its goals." *Id.* at 807.

■ The Court concludes that, weighing the above factors in light of the record presented in the instant case, the challenged prohibition withstands substantive due process scrutiny. Initially, the Court notes that the legitimacy of the governmental interest underlying the challenged prohibition has already been adequately discussed in regard to the plaintiffs' First Amendment challenge. The Court concluded above that the government's interest in preventing American firms from actively cooperating in the boycott of Israel is a substantial one.

The interest of the plaintiffs, on the other hand, is purely economic. Although the record indicates that it is more likely than not that the failure of Trane and UTC to answer the questionnaires will result in adverse economic consequences, (Stip. ¶ 29–31), it is well established that "Congress has broad latitude to readjust the burdens of the private sector in furtherance of a public purpose." *Nachman, supra,* 592 F.2d at 958. Plaintiffs argue, nonetheless, that the economic impact of the challenged prohibition is disproportionate and unfairly burdens arbitrarily selected persons, such as Trane and UTC. There is, however, nothing in the legislative scheme adopted by Congress which would necessarily create a disproportionate burden on the plaintiffs. To the extent that there is a disproportionate impact or arbitrary effect on certain persons, it is due to the actions of Arab boycott officials, not to the legislation challenged here.

It is important to note also that the governmental regulation challenged here occurs in an area—international commerce—which Congress traditionally has had authority to regulate pursuant to the powers enumerated in Article I, Section 8 of the Constitution. *See California Bankers Ass'n v. Schultz,* 416 U.S. 21, 46, 94 S.Ct. 1494, 1510, 39 L.Ed.2d 812 (1974).

Finally, the Court notes, as it did previously with regard to plaintiffs' First Amendment argument, that the legislation challenged here is narrowly drawn so as to moderate the impact of the burden. The only information which a United States person is prohibited from providing is boycott-related information requested by boycott officials or which furthers the boycott, such as the information which the plaintiffs wish to provide in response to the questionnaires received. As noted previously, the Commerce Department regulations do not prevent United States persons from providing business information to boycotting countries in the normal commercial context. *See* 15 C.F.R. § 369.2(d)(3). Thus, the statute and regulations go no farther than is reasonably necessary to stifle the flow of boycott-related information from American companies. *Cf. Briggs, supra,* 539 F.Supp. at 1316–17.

Having considered the various factors noted by the Seventh Circuit in *Nachman* and by the Ninth Circuit in *Beller,* the Court finds that the challenged portions of the legislation "represent a rational means to a legitimate end." *Nachman, supra.* This is so notwithstanding the various examples of alleged irrationality cited by plaintiffs in their initial brief. *See* Plaintiffs' Mem. at 79–85. While these various examples may serve to illustrate the difficulty involved in drafting a perfect statute or regulation, or perhaps demonstrate that certain hardships may be placed upon the plaintiffs, they do not, in the Court's view, indicate that the challenged legislation is arbitrary and irrational.

For the foregoing reasons, the Court must reject plaintiffs' Fifth Amendment substantive due process argument.

## IV. PROCEDURAL DUE PROCESS CHALLENGE

Plaintiffs argue that the challenged prohibition violates their right to procedural due process under the Fifth Amendment because it places them in jeopardy of being deprived of substantial property interests

without first having an opportunity to correct or otherwise respond to implicit misinformation in the questionnaires. They contend that the challenged provisions prevent them from minimizing the risk that Arab states will erroneously impose sanctions upon them pursuant to the general boycott principles. While conceding, as they must, that the Fifth Amendment does not require Arab states to provide notice and an opportunity to be heard before the imposition of sanctions (i.e., blacklisting), plaintiffs argue that the challenged prohibition is unconstitutional because it "authorizes, encourages, and virtually compels the result which is forbidden by the Fifth Amendment." Plaintiffs' Mem. at 87–88 n. 1. As plaintiffs characterize their argument, "This is not a case where plaintiffs claim that a private person has shot them under color of governmental authority, but rather a case where the Government has actively prevented the plaintiffs from dodging as the trigger is pulled." *Id.*

Plaintiffs are correct that the Fifth Amendment's protection is not limited merely to conduct initiated by the government. *See Bell & Howell Co. v. NLRB,* 598 F.2d 136, 149 (D.C.Cir.), *cert. denied,* 442 U.S. 942, 99 S.Ct. 2885, 61 L.Ed.2d 312 (1979). Government actions which "authorize" or "encourage" private conduct which the government is forbidden to engage in by virtue of the Fifth Amendment is equally proscribed. *Id.* (citing *Reitman v. Mulkey,* 387 U.S. 369, 375, 87 S.Ct. 1627, 1631, 18 L.Ed.2d 830 (1967). But this is not a case of the government authorizing or encouraging private conduct which would be unlawful if engaged in by the government. Unlike the facts in *Bell & Howell, supra,* and *NLRB v. Mansion House Center Management Corp.,* 473 F.2d 471 (8th Cir.1973), the present case does not involve government recognition or enforcement of unlawful conduct. Thus, plaintiffs' procedural due process rights are not implicated by reason of the threat of boycott sanctions.

Moreover, contrary to plaintiffs' assertion, the prohibition challenged here does not "virtually compel" the imposition of sanctions upon Trane and UTC. As stated in the stipulation of facts, the prohibition against the plaintiffs answering the questionnaires only makes it "more likely than not" that sanctions will be imposed by boycott authorities. (Stip. ¶¶ 29–31). Thus, the threat to the plaintiffs' economic interests are at best only probable.

For the reasons stated above, the Court concludes that the challenged prohibition does not violate plaintiffs' Fifth Amendment procedural due process rights.

## V. NINTH AMENDMENT CHALLENGE

As their final argument, plaintiffs assert that the prohibition against furnishing information violates the Ninth Amendment (as well as various principles established by the First, Fifth, and Sixth Amendments) because it denies them their fundamental right to correct misapprehensions by providing truthful information about themselves, without advancing a compelling governmental interest which would justify such a denial.

The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." In *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court held that the Constitution provides protection for certain fundamental rights not specifically enumerated therein. The opinion of the Court described these rights as "penumbras" of the specific guarantees of the Bill of Rights. *Id.* at 484, 85 S.Ct. at 1681. In his concurring opinion, Justice Goldberg concluded that these rights have as their constitutional authority the Ninth Amendment. *Id.* at 486–499, 85 S.Ct. at 1682–90. He described these rights as "fundamental personal rights," *id.* at 492, 85 S.Ct. at 1686, and concluded that the test for determining the existence of such rights is "whether a right involved 'is of such a character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions"....'" *Id.* at 493, 85 S.Ct. at 1686

(quoting *Powell v. Alabama,* 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158 (1932)).

██ In the instant case, plaintiffs seek to extend the Ninth Amendment's protection to their desired communications, citing fundamental rights stemming from the First, Fifth, and Sixth Amendments. *See* Plaintiffs' Mem. at 90–92. In the Court's view, however, this proposed extension of Ninth Amendment protection is without merit. Whether viewed as penumbral rights emanating from the guarantees of the Bill of Rights, or as fundamental rights preserved by the Ninth Amendment, the rights which plaintiffs cite here with regard to their desired communications do not constitute the type of personal liberties or interests in privacy which traditionally have been viewed as fundamental. *Cf. Fitzgerald v. Porter Memorial Hospital,* 523 F.2d 716, 719–21 (7th Cir.1975); *Breen v. Kahl,* 419 F.2d 1034 (7th Cir.1969). Plaintiffs have provided no persuasive authority which would justify the extension of Ninth Amendment protection to their desired communications. Accordingly, the Court concludes that plaintiffs' Ninth Amendment challenge must be rejected. *Cf. Briggs, supra,* 539 F.Supp. at 1317.

## CONCLUSION

Summary judgment is appropriate when it appears that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fitzsimmons v. Best,* 528 F.2d 692, 694 (7th Cir.1976); Fed.R.Civ.P. 56(c). Here, the parties have filed cross-motions for summary judgment on the basis of a very thorough record which leaves no material facts in dispute. On the basis of that record, the Court concludes that the challenged prohibition against furnishing information does not infringe upon the plaintiffs' First Amendment right of free speech, their Fifth Amendment substantive or procedural due process rights, or their rights under the Ninth Amendment. Accordingly, the Court holds that defendants are entitled to judgment as a matter of law.

Therefore, the Court hereby DENIES plaintiffs' motion for summary judgment and GRANTS defendants' motion for summary judgment.

SO ORDERED this 4th day of January 1983, at Milwaukee, Wisconsin.