**KAREN MARITIME LIMITED,**
Petitioner,

v.

**OMAR INTERNATIONAL INCORPORATED,**
Respondent.

**No. CV–03–6120.**

United States District Court,
E.D. New York.

April 23, 2004.

Daniel J. McInerney, Jr., Hill Rivkins & Hayden LLP., New York City, for Petitioner.

Michael A. Haskel, Garden City, NY, for Respondent.

**MEMORANDUM AND ORDER**

PLATT, District Judge.

Karen Maritime Limited ["Karen"] petitions the Court to confirm a foreign ar-

bitral award against Respondent Omar International Incorporated ["Omar"]. Petitioner seeks this relief pursuant to the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards ["the Convention"], 21 U.S.T. 2517, codified at 9 U.S.C. §§ 1–16 and 201–08. Respondent argues that confirmation of the award would violate the public policies of the United States—opposition to the Arab boycott of Israel, as expressed in 50 U.S.C.App. § 2407, as well as federal and State anti-discrimination laws found at 42 U.S.C. § 1981 and N.Y. Exec. § 296—and that the Court should refuse to confirm the award under the public policy exception contained in Article V(2)(b) of the Convention. For the following reasons, the Court **GRANTS** Karen's petition.

## Background

Karen was a Liberian transportation corporation doing business in the United Kingdom. Omar is an importer that is incorporated and does business in the United States. Karen and Omar entered into a charterparty agreement dated September 26, 1984 under which Karen would provide Omar with a ship, the Motor Vessel *Karen*, to transport 23,750 tons of wheat from Baie Comeau, Canada to Tartous, Syria. *See* Karen's Amended Verified Petition to Confirm an Arbitration Award at ¶¶ 1, 2 and 6; Omar's Memorandum of Law in Opposition to Karen's Petition at 1; Karen's Reply Memorandum in Support of its Petition at 7.

A dispute arose between Karen and Omar during the course of the M/V *Karen's* journey from Canada to Syria, and Omar refused to pay Karen in full for its use of the ship. London arbitrators ultimately awarded Karen $170,072.30 (plus interest) in damages and costs, as well as attorney's fees. This approximate sum is being held in escrow pending confirmation of the arbitral award. Omar seeks to avoid paying the arbitral award to Karen on the grounds that ¶ 48 of the charterparty agreement read that "Owners warrant this vessel is not Israeli owned or controlled, [and] will not call at Israeli ports," and that confirmation of the award would violate the public policies of the United States. Karen's Petition at ¶¶ 12–18 and Exhibit 1; Omar's Memorandum at 1–2.

## Discussion

### A. *Legal standards*

(i) *Non-recognition of foreign arbitral awards on public policy grounds*

■ Judicial policy strongly favors recognition by American courts of foreign arbitral awards. As the United States Supreme Court stated in *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 516–17, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), a "parochial refusal by the courts of one country to enforce an international arbitration agreement would ... damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements." However, Article V(2)(b) of the Convention provides that confirmation of a foreign arbitral award may be refused if "the recognition and enforcement of the award would be contrary to the public policy of that country," and the Supreme Court recognizes this exception. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 638, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (stating that the "Convention reserves to each signatory country the right to refuse enforcement of an award" under Art. V(2)(b)); *see also Scherk*, 417 U.S. at 520 n. 14, 94 S.Ct. 2449 (stating that fraud could be grounds upon which to refuse recognition of a foreign arbitral award for reasons of public policy).

The United States Court of Appeals for the Second Circuit interprets Article V(2)(b) narrowly, to apply to "situations where the contract as interpreted by the arbitrators would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 264 (2d Cir.2003) (citation omitted). The public policy exception should be applied "only where enforcement would violate our most basic notions of morality and justice," *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir.1998) (citation and quotation marks omitted), as an "expansive construction of this defense would vitiate the Convention's basic effort to remove preexisting obstacles to enforcement," and tempt foreign courts to "frequently accept it as a defense to enforcement of arbitral awards rendered in the United States." *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier*, 508 F.2d 969, 973–74 (2d Cir.1974).

The Court of Appeals has upheld the confirmation of foreign arbitral awards that losing parties complained had been made in contravention of claimed United States policies prohibiting trade with Iran, *see MGM Prods. Group., Inc. v. Aeroflot Russian Airlines*, 91 Fed.Appx. 716, 718, 2004 WL 234871 at *1 (2d Cir. 2004) (unpublished opinion); prohibiting the issuance of pre-arbitral hearing security orders against wholly-owned foreign corporations, *see Banco de Seguros*, 344 F.3d at 264; prohibiting forgery, *see Europcar Italia*, 156 F.3d at 315; disfavoring inconsistent testimony in legal proceedings, *see Waterside Ocean Navigation Co. v. International Navigation Ltd.*, 737 F.2d 150, 152 (2d Cir.1984); and against the performance of a contract in Egypt by an American business after the severance of diplomatic relations between Washington and Cairo during the 1967 Six–Day War, *see Parsons & Whittemore*, 508 F.2d at 973–74.

District courts within this jurisdiction have confirmed foreign arbitral awards that losing parties complained were made in contravention of claimed United States policies against the violation of due process, an improper decision regarding the severability of arbitration clauses in contracts, the misapplication of Ukranian law, trade with Cuba, the arbitrators' reliance on personal knowledge not in the arbitral record, the arbitrators' failure to apply the relevant contract, violation of the doctrine of laches, the confirmation of an award over a contrary Pakistani judgment, manifest disregard of American and British law, and a requirement that an obligation be paid in gold.[1]

1. *See Sarhank Group v. Oracle Corp.*, 2002 WL 31268635 at *7, 2002 U.S. Dist. LEXIS 19229 at *21–22 (S.D.N.Y. Oct. 8, 2002), *Saudi Iron and Steel Co. v. Stemcor USA Inc.*, 1997 WL 642566 at *3, 1997 U.S. Dist. LEXIS 16129 at *7 (S.D.N.Y. Oct. 17, 1997), and *Anhui Provincial Imp. and Exp. Corp. v. Hart Enters. Int'l, Inc.*, 1996 WL 229872 at *4, 1996 U.S. Dist. LEXIS 6041 at *10–11 (S.D.N.Y. May 7, 1996), *International Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera*, 745 F.Supp. 172, 181 (S.D.N.Y. 1990) (due process); *Coutinho Caro & Co. v. Marcus Trading, Inc.*, 2000 WL 435566 at *12, 2000 U.S. Dist. LEXIS 8498 at *38 (D.Conn. Mar. 14, 2000) (severability); *Ukrvneshprom State Foreign Econ. Enters. v. Tradeway, Inc.*, 1996 WL 107285 at *6, 1996 U.S. Dist. LEXIS 2827 at *17 (S.D.N.Y. Mar. 12, 1996) (Ukranian law); *Belship Navigation, Inc. v. Sealift, Inc.*, 1995 WL 447656 at *6, 1995 U.S. Dist. LEXIS 10541 at *17–18 (S.D.N.Y. July 28, 1995) (trade with Cuba); *Matter of Avraham, Shigur Express, Ltd.*, 1991 WL 177633 at *3, 1991 U.S. Dist. LEXIS 12267 at *9 (S.D.N.Y. Sept. 4, 1991) (knowledge dehors the record); *Jamaica Commodity Trading Co. v. Connell*

Furthermore, in a decision almost exactly on point with the instant case, *Antco Shipping Co., Ltd. v. Sidermar S.p.A.*, 417 F.Supp. 207, 217 (S.D.N.Y.1976), a District Court declined to issue a stay of arbitration on the petitioner's grounds that the contract forming the basis of the arbitration supported the Arab boycott of Israel.

Respondent Omar therefore encourages this Court to rule contrary to the decision of a District Court regarding similarly-situated parties in *Antco Shipping,* and to be the first court in this jurisdiction, and possibly any American jurisdiction, to refuse to confirm a foreign arbitral award on the basis of Article V(2)(b) of the Convention.

(ii) *50 U.S.C.App. § 2407 and the Arab boycott of Israel*

The Export Administration Act prohibits any United States person, with respect to his activities in foreign commerce, from complying with any boycott imposed by a foreign country against a country friendly to the United States. Prohibited activities include refusing to do business in the boycotted country, or furnishing information about the national origin of the owner of his business. *See* 50 U.S.C.App. § 2407.

Section 2407 is a constitutional statute. "Congress enacted this law in response to the longstanding Arab boycott of Israel. Section 2407 was intended to stop the secondary and tertiary boycotts that Congress considered detrimental to both the United States and Israel." *Israeli Aircraft Indus., Ltd. v. Sanwa Business Credit Corp.,* 850 F.Supp. 686, 690 (N.D.Ill. 1993) (citing 123 CONG. REC. H11418–H11449 (1977)); *see also Bulk Oil A.G. v. Sun Co., Inc.,* 583 F.Supp. 1134, 1140 (S.D.N.Y.1983) (stating that the law was "specifically aimed at taking a 'stronger stand' on the problem of the Arab boycott of Israel and its impact on United States business"). A Circuit Court of Appeals construing § 2407 upheld fines levied by the Government against a lawyer who completed and failed to inform the Commerce Department about "a Saudi Arabia trademark registration form that asked whether his client had a business relationship with Israel." *United States v. Meyer,* 864 F.2d 214, 216 (1st Cir.1998). Federal courts have also found that there is no First Amendment right "to answer questions asked by Arab boycott offices pursuant to the Arabs' trade boycott of Israel," *Briggs & Stratton Corp. v. Baldrige,* 728 F.2d 915, 916 (7th Cir.1984); and that § 2407, as applied, violates neither Fifth Amendment procedural or substantive due process rights, nor the Ninth Amendment rights, of American businesses. *See Trane Co. v. Baldrige,* 552 F.Supp. 1378, 1391 (W.D.Wis.1983).

The Court is therefore presented with the question of whether to confirm an arbitral award based upon a contract that al-

*Rive & Sugar Co.,* 1991 WL 123962 at *5, 1991 U.S. Dist. LEXIS 8976 at *15 (S.D.N.Y. July 3, 1991) (application of the relevant contract); *A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.,* 1989 WL 115941 at *5, 1989 U.S. Dist. LEXIS 11401 at *5 (S.D.N.Y. Sept. 27, 1989) (laches); *American Constr. Mach. & Equip. Corp. v. Mechanised Constr. of Pakistan Ltd.,* 659 F.Supp. 426, 429 (S.D.N.Y. 1987) (contrary Pakistani judgment); *Brandeis Intsel Ltd. v. Calabrian Chems. Corp.,* 656 F.Supp. 160, 169 (S.D.N.Y.1987) (manifest disregard); and *Konkar Indomitable Corp. v. Fritzen Schiffsagentur und Bereederungs GmbH,* 1981 U.S. Dist. LEXIS 9637 at *8–9 (S.D.N.Y. May 1, 1981) (gold clause).

A District Court within this jurisdiction also contemplated refusing to confirm an arbitral award on the basis of Article V(2)(b) due to a claim of duress, but found that the claim was not proven. *See Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G.,* 480 F.Supp. 352, 358–61 (S.D.N.Y.1979).

legedly violates public policy as expressed by a valid, enforceable law.

## B. *Analysis*

### (i) *Anti-discrimination laws*

■ The argument that the arbitral award should not be confirmed on the basis of federal and State anti-discrimination laws may be dealt with briefly.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. The charterparty's objectionable language—that the M/V *Karen's* owners "warrant this vessel is not Israeli owned or controlled [and] will not call at Israeli ports"—applies to individuals outside the jurisdiction of the United States. (Section 1981 could apply to an Israeli businessman residing in the United States, but this circumstance is not presented by the record. The M/V *Karen's* owners are citizens of Greece. *See* Petitioner's Memorandum at 9.)

Section 296(13) provides that it shall be an unlawful discriminatory practice to boycott any person because of, *inter alia,* the national origin of that person's business associates. *See* N.Y. Exec. § 296. Section 296 does apply to this case; however, the correlative federal statute provides a stronger basis for the decision of a federal court.

### (ii) *Anti-boycott laws*

Four decisions within this jurisdiction bear upon the instant case: *MGM,* 91 Fed.Appx. 716, 2004 WL 234871; *Parsons & Whittemore,* 508 F.2d 969; *Belship Navigation,* 1995 WL 447656, 1995 U.S.

Dist. LEXIS 10541; and *Antco Shipping,* 417 F.Supp. 207.

*MGM* involved a claim of United States public policy against trade with Iran. The Court of Appeals found that it was "doubtful" that the agreement at issue actually violated the Iranian Transactions Regulations, and as such, the agreement "cannot be said to violate fundamental public policy." *Id.* at 713, 2004 WL 234871, at *1. Therefore, the Court of Appeals did not hold that trade with Iran did not violate public policy, it held that the parties had not necessarily engaged in prohibited trade. In this case, there is a stronger argument that under the terms of 50 U.S.C.App. § 2407, the parties supported, as expressed by the clause in the charterparty agreement, the Arab boycott of Israel.

*Parsons & Whittemore* involved an American business that refused to perform a contract in Egypt after the severance of United States diplomatic relations during the Six–Day War between the Arab states and Israel. The business argued that further work on its project at that time would have violated United States public policy against the actions of the Egyptian government. The Court of Appeals found that this argument sought to equate "national" policy with "public" policy, and rejected the argument, holding that to "read the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility. This provision was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.'" *Id.* at 974.

The respondent in *Parsons & Whittemore* pointed to no specific legislation expressing United States policy towards Egypt; instead, it referred only to the withdrawal of diplomats. The *Parsons & Whittemore* court was prescient to be

leery of the "vagaries of international politics": within four years of the court's decision, America brokered the Camp David peace accord between Egypt and Israel, and Cairo became an ally that receives billions of dollars a year in aid from Washington. In this case, however, Respondent Omar points not to generalized notions of the foreign policy of the United States, but to a specific statute as the basis of its claim of public policy. The claim of Omar is thus more statutorily based than that of the respondent in *Parsons & Whittemore.*

*Belship Navigation* involved a claim of United States public policy against trade with Cuba. The District Court relied upon *Parsons & Whittemore* to hold that although " 'national policy' prohibits dealing with Cuba, the 'public policy' exception in the Convention" did not cover Washington's embargo of Havana. 1995 WL 447656 at *6, 1995 U.S. Dist. LEXIS 10541 at *17–18 (citing 508 F.2d at 974). *Belship Navigation* is not substantially distinguishable from this case. The American embargo of Fidel Castro's regime is as statutorily rooted, and even longer-lived, than the official American policy against the Arab boycott of Israel. *Antco Shipping,* like this case, involved a claim of United States public policy against the Arab boycott of Israel. The District Court, relying on *Parsons & Whittemore,* declined to stay arbitration on these grounds. *See id.* at 217. *Antco Shipping* is distinguishable from this case only in that *Antco Shipping* predates the current, more restrictive version of the statute prohibiting support of the Arab boycott, 50 U.S.C.App. § 2407, which passed into law in its current form in 1979. The petitioner in *Antco Shipping* relied upon a version of 50 U.S.C.App. § 2402(5), passed in 1969, which stated in general terms that "[i]t is the policy of the United States to oppose restrictive trade practices or boycotts fostered or imposed by foreign countries against other countries friendly to the United States." *Id.* at 211.

The law cited by Respondent Omar, § 2407, more specifically prohibits Americans from refusing to do business with Israel or furnishing information about any Israeli ownership owner of their business. The charterparty agreement states that "Owners warrant this vessel is not Israeli owned or controlled, [and] will not call at Israeli ports." In signing a contract containing such language, Omar, a United States person active in foreign commerce, likely violated § 2407. (Petitioner Karen is not a United States person.)

The Court finds that § 2407 represents an explicit public policy, well defined and dominant, as may be ascertained by reference to the United States Code. Enforcement of the award, if it legitimized or perpetuated the Arab boycott of Israel, would violate basic American notions of morality and justice.

Yet the Court also finds that the obnoxious clause in the charterparty agreement in no way forms the basis of the arbitral award. Respondent Omar's non-payment of its contractual obligations, and Petitioner Karen's alleged non-performance of its contractual duties, have nothing to do with the Arab boycott. It is the British/Liberian Karen, and not the American Omar, who warrantied that their shipping company was "not Israeli owned or controlled," and that their ship, the M/V *Karen,* would "not call at Israeli ports." As Karen states in its papers,

> The clause benefitted Respondent and provided nothing to Karen. Karen did not request the inclusion of this clause in the charterparty. Karen simply certified the fact that it was not owned by individuals who were Israeli and that the vessel would directly perform the charterparty, by carrying the cargo from the

identified ports without certain interim stops.

Karen's Reply Memorandum at 3.

Omar is an unlikely tribune for the public policies of the United States or the interests of Israel. The Court observes, with distaste, that the charterparty agreement to facilitate trade with Syria was entered into in 1984, only a year after Syrian-supported terrorists murdered 241 American servicemen at the Marine barracks in Beirut, as well as 17 more Americans at the United States Embassy in that city. Judicial notice is taken that Syria was then, and is now, a state sponsor of terrorism against America, Israel and others.[2] As such, Omar's hortatory invocations of American–Israeli friendship, and especially of the baleful events of September 11th 2001, ring quite hollow.

Omar lacks clean hands. It would be inequitable to allow Omar to avoid the consequences of the arbitral award against it on the basis of its discovery, twenty years late, that the charterparty agreement contained an illegal clause to which Omar voiced no legal, moral or patriotic objections at the time. Indeed, Karen claims in its Reply Memorandum that the "clause was apparently required by Respondent so that respondent could be assured that Karen's vessel would be able to perform the requirements of the charterparty." *Id.* at 5.

### Conclusion

The Court is faced with the duty of reconciling the strong judicial policy in favor of the recognition of foreign arbitral awards with the equally strong executive and legislative policies in opposition to the Arab boycott of Israel. If the breach of contract that Petitioners recovered upon had to do with the Arab boycott—if, for example, the arbitrator's award had been based upon Respondent wishing to have the M/V *Karen* call at an Israeli port— then refusing to confirm the arbitral award on the basis of public policy might well be appropriate. Such facts are not, however, presented by this case.

The public policy cited by Omar has nothing to do with the reasons that the arbitrator found against them. Accordingly, the Court hereby **GRANTS** Karen's petition, and confirms the award in Petitioner's favor.

**SO ORDERED.**

---

**2.** *See* 22 U.S.C. § 2151 (stating that Syria is "a state sponsor of terrorism," possibly "responsible due to its facilitation of terrorist activities and its shipments of military supplies to Iraq" for "harm to Coalition armed forces" there); *see also* the State Department's *Patterns of Global Terrorism* (stating that Syria supports "Hizballah, HAMAS, [Palestinian Islamic Jihad], and other Palestinian rejectionist groups that conduct terrorist operations … [and] condone[s] Palestinian suicide bombings and other attacks against civilian targets within Israel") (available at *www.state.gov/s/ct/rls/pgtrpt/2002/html* ).